HOUSTON BELT & TERMINAL RAILWAY
COMPANY et al., Appellants,

v.

Kurt BURMESTER, Appellee.

No. 13041.

Court of Civil Appeals of Texas.

Houston.

Nov. 21, 1957.

Supplemental Opinion Dec. 5, 1957.

Rehearings Denied Jan. 30, 1958.

Fulbright, Crooker, Freeman, Bates & Jaworski, and M. S. McCorquodale and Quentin Bates, Houston, for appellant Houston Belt and Terminal Ry. Co.

Chilton Bryan and E. H. Patton, Jr., Houston, for appellants James W. Maxcey, D. D. Danner and Danner's Marine Guard Service.

Eastham & Dale and Clarence S. Eastham, Houston, and Lockhart, Watson & Peterson, and Edward W. Watson, Galveston, for appellant Marina Mercante Nicaraguense, S. A.

John L. Hill and W. James Kronzer, Houston, Hill, Brown, Kronzer & Abraham, Houston, of counsel, for appellee.

WOODRUFF, Justice.

This is a personal injury suit instituted by the appellee, Kurt Burmester, against the appellants, Houston Belt & Terminal Railway Company, James W. Maxcey, D. D. Danner, and Danner's Marine Guard Service, a Partnership, in which Marina Mercante Nicaraguense, S. A., intervened. As suggested by counsel, the appellants and intervenor, for the sake of brevity, will be referred to hereafter as Belt, Danner, and Intervenor.

Appellee, Kurt Burmester, a German national, sought a recovery of damages totaling $213,500 accruing to him by reason of personal injuries sustained by him on December 23, 1954, while he was riding in an automobile owned by Danner and being driven by an employee, Lawrence Gregg, when it collided with an engine belonging to Belt and being operated by its employees. No claim was made by any party that appellee was in any wise contributorily negligent.

In response to 46 special issues, the jury returned a verdict finding Belt and Danner jointly guilty of several acts of negligence proximately causing the collision, and fixed damages for physical pain, mental anguish and diminished earning capacity both past and future, in the sum of $160,000. In addition thereto, in response to other appropriate issues, the jury found damages accruing to appellee in the sum of $8,847 for past hospital bills, $350 for a doctor's bill, and $10,000 for future medical and hospital expenses. Appellee having remitted $1,250.95 in connection with the accrued hospital bills, and $4,550 on the future medical and hospital expenses, the trial court on January 4, 1956, entered judgment on the verdict in behalf of appellee for a net amount of $173,396.05 against Belt and Danner jointly and severally, and further decreed that intervenor take nothing.

Thereafter, on January 20, 1956, the trial court made findings of fact that intervenor had paid medical, hospital, doctor bills, and reasonable maintenance for appellee Burmester in the total sum of $8,190 for which it had not been reimbursed. A finding was also made that such charges were reasonable and necessarily incurred by reason of the injuries sustained by Burmester and he would be in need of future medical, hospital and doctor bills as appeared in the verdict.

Motions for new trial were duly filed by Belt, Danner, and Intervenor, all of which were presented and overruled, notice of appeal given and an appeal has been duly perfected by each of them complaining of the trial court's action in rendering the judgment and in failing to grant appellants' motions for new trial.

Appellants, Belt and Danner, by appropriate points of error complain that the failure of the juror, Marshall L. Elliott, to disclose on voir dire examination in answer to questions propounded to the jury panel by the appellee's and appellants' counsel, that he had been the plaintiff in a workmen's compensation suit and had filed another claim for workmen's compensation benefits, was misconduct which entitled them to a new trial.

The testimony which was offered in connection with the presentation of their motion for new trial showed that more than five years before this trial the juror Elliott had filed a compensation claim while working for Austin Bros. and received $3,000 in settlement thereof on July 10, 1951. He was represented by Mr. Albert P. Jones, of the firm of Helm & Jones, and at that time appellee's counsel were associated with that firm. It is undisputed, however, that juror Elliott did not know either of appellee's attorneys, nor did they know him. Nor is it disputed that Elliott had also collected $50 on two previous claims without being represented by counsel.

Appellants contend that the mere fact that the juror did not act in bad faith, or that he did not intend to mislead anyone by withholding such information is not material. It is the concealment that is material, so they contend, because an uncertainty as to what effect such claims might have had upon him was thereby created and counsel for appellants would not have taken Elliott on the jury if they had known of his prior claims. Thus, they conclude, the materiality of the failure of the juror to answer the question "would seem undisputed." In support of their position, appellants rely upon Traders & General Insurance Company v. Cossman, Tex.Civ. App., 212 S.W.2d 865; Dallas Railway & Terminal Company v. Kurth, Tex.Civ.App., 247 S.W.2d 930, writ ref., n. r. e.; and especially upon Texas Employers' Ins. Ass'n v. Wade, Tex.Civ.App., 197 S.W.2d 203, 210 writ ref., n. r. e. In the last case cited this Court, in a somewhat similar situation, reasoned that, "the mere fact that the juror did not act in bad faith is not the question to be determined in a case of this character. The question is whether a proper tribunal was established, and not whether an improperly established tribunal acted fairly." Not being able to measure with any degree of certainty the effect the prior claims of the juror had had upon his state of mind or in what way it might have affected him as a juror, it was further held that, "Since this uncertainty exists" the cause should be reversed and remanded for a new trial. This decision was handed down October 24, 1946, and the Cossman and Kurth cases followed in 1948 and 1952, respectively.

In Childers v. Texas Employers' Insurance Ass'n, 154 Tex. 88, 273 S.W.2d 587, where a juror during his voir dire examination forgot about a hernia claim for which he had received compensation in the sum of $400 and doctor bills eleven years prior to the date of the trial in which he was taken as a juror and, therefore, failed to disclose this fact to the appellant's attorneys upon voir dire examination, it was held that such failure to disclose was not the test to be applied unless the evidence showed that the concealment of

such fact resulted in probable injury to the complaining party. The references cited in support of this ruling were Rules 327, 434, and 503, Texas Rules of Civil Procedure. In this connection mention should be made of the fact that Rule 327 was amended effective January 1, 1955, wherein the clause, "or that a juror gave an erroneous or incorrect answer on voir dire examination," was inserted.

It should also be observed that the only cases referred to by style in the Childers case were Traders & General Insurance Company v. Cossman, supra; Texas Employers' Insurance Ass'n v. Wade, supra; and Dallas Railway & Terminal Company v. Kurth, supra. The Supreme Court, in reversing the Court of Civil Appeals, cited these cases as being the authorities upon which the Court of Civil Appeals had relied in rendering its opinion, 269 S.W.2d 463.

Therefore, the rule established by the three above mentioned cases to the effect that if uncertainty existed as the result of the failure of a juror to make a disclosure of material information when questioned on voir dire examination the complaining party was thereby entitled to a new trial because of having been deprived of a trial before a properly established tribunal, was overruled by the opinion of the Supreme Court in Childers v. Texas Employers' Insurance. Ass'n, supra.

■ This Court has heretofore recognized this fact in Thompson v. Quarles, 279 S.W.2d 321, 326, wherein it was said:

"We are governed by Childers v. Texas Employers' Insurance Association, 154 Tex. 88, 273 S.W.2d 587, 588, departing from the contrasting rule announced in Texas Employer's Ins. Ass'n v. Wade, Tex.Civ.App., 197 S.W.2d 203; Traders & General Ins. Co. v. Cossman, Tex.Civ.App., 212 S.W.2d 865; and Dallas Ry. & Terminal Co. v. Kurth, Tex.Civ.App., 247 S.W.2d 930, and holding that under Rules 327, 434, and 503, T.R.C.P., 'The failure of the juror on his voir dire examination to disclose information that he had suffered previous injuries is not the test * * *, unless the evidence shows that he concealed the fact of previous injury * * *, *and that such action resulted in probable injury * * *',"*

We, therefore, must pass to the material inquiry as to whether or not the appellants have shown that juror Elliott's failure to answer the questions concerning prior injuries resulted in probable injury to appellants.

The testimony on the motion for new trial showed that the juror, Marshall L. Elliott, was 49, years of age, married, and the father of 5 children. He had a ninth grade education and had been a structural steel worker for more than 20 years. The company where he worked did not pay for his time while he was on jury duty and, therefore, he had not wanted to serve as a juror. He testified that he sat on the third row of seats during the voir dire examination and that each time counsel asked questions about prior claims he raised his hand and kept it raised for a considerable period of time. Another prospective juror, Mrs. I. N. Tower, who sat on his right, corroborated his testimony. She said he held it up a long time; it might have been twenty minutes, and that he had his hand up three different times. She also said that he put his hand up when the question about law suits and personal injuries was asked by Mr. Hill (appellee's counsel) and once when questions were being asked by one of the other lawyers but no one ever recognized him to give the information about any accidents he had had. Mr. J. T. Lindley, a juror who was seated on the other side of Mr. Elliott during voir dire examination, also said he saw Elliott raise his hand twice although he couldn't remember the exact questions which the lawyer had asked the panel at that time.

Appellants point out, however, that Mr. M. S. McCorquodale and Mr. Quentin

Bates, attorneys for Belt, Mr. N. A. Gallagher, claims agent for Belt, Mr. Chilton Bryan and Mr. E. H. Patton, attorneys for Danner, all testified that they were watching the members of the jury panel and never saw the juror Elliott raise his hand. Moreover, Mr. John Hill and Mr. W. J. Kronzer, attorneys for appellee, said they had no recollection of having seen this juror raise his hand.

Juror Elliott testified, however, that each time he held his hand up the line of inquiry was shifted before the lawyers recognized him. Appellants emphasized the fact that Elliott did not volunteer the information when he was interrogated later although no questions regarding prior claims were asked him individually. He stated that he forgot about it at the time. He was seated as the twenty-fifth juror on the panel of thirty.

The testimony on the motion for new trial also showed that the traffic noise was very loud in the courtroom during the voir dire examination and that two other prospective jurors were either not recognized or did not disclose information sought to be elicited by the general questions asked by Mr. Hill. Later, however, by individual questions being propounded to them or by voluntary statements the information was given to the attorneys.

According to the testimony of the three jurors, who testified upon the motion for new trial, Elliott did not mention his own injury during the jury deliberations nor did he attempt or undertake to influence the jury verdict. It was shown, however, that in the early stages of the discussion of the damage issue, someone suggested that an award of $200,000 be made, whereupon, Elliott suggested that they should consider each element of the issue separately and see how they came out.

The foregoing testimony amply supports the trial court's fact findings made in connection with his ruling on the motion for new trial to the effect that Elliott did not intentionally fail to disclose that he had

sustained accidental compensation injuries, but that he had tried to impart such information by raising his hand on two occasions, but that he was interrupted by counsel who changed to other matters of inquiry; that Elliott did not know appellee's counsel, nor did they know him, before the trial; that Elliott never mentioned his prior injuries to any member of the jury; that during the jury's consideration of the damage issue Elliott requested the jury not to reach a verdict by agreeing to a lump sum but to itemize each element of damage, which resulted in a lesser verdict being rendered.

█ A careful consideration of all the facts and circumstances relative to the voir dire examination of the juror Elliott leads us to the conclusion that his failure to answer the general question propounded to the panel regarding prior injuries, when considered with his attempts to do so and his demeanor as a juror after his selection, wholly fails to present an affirmative showing that such action resulted in probable injury or prejudice to appellants. Thompson v. Quarles, Tex.Civ.App., 297 S.W.2d 321, writ ref., n. r. e.; Dallas Railway & Terminal Co. v. Flowers, Tex.Civ.App., 284 S.W.2d 160, writ ref., n. r. e.; Childers v. Texas Employers' Insurance Ass'n, 154 Tex. 88, 273 S.W.2d 587.

The trial court did not err in failing to grant a new trial, and the appellants' contention that the failure on the part of the juror Elliott to disclose on voir dire examination that he had had a workmen's compensation suit and a claim for workmen's compensation benefits resulted in probable injury to them under the facts of this case is hereby overruled.

Appellant Danner urges as a point of error that appellee Burmester was a guest within the meaning of Article 6701b, Vernon's Ann.Tex.Civ.St., and not a passenger for hire in appellant's automobile, and that appellee failed to either request or obtain a jury finding that he was a passenger for hire although the appellant Danner ex-

cepted to the charge because no such issue was submitted to the jury, and that the case should therefore be reversed.

It is Danner's position that they were primarily in the business of furnishing guards and watchmen for vessels in port, and were transporting appellee Burmester to the airport as an accommodation. Appellant Maxcey testified that he and his partner, Danner, doing business as Danner's Marine Guard Service, furnished as one "of the lesser services" the type of service that was being rendered to appellee on this occasion. He testified, too, that they furnished transportation to aliens from a ship to an airport. Their records showed that there was no charge made for this service rendered to appellee Burmester on this occasion, although the confusion caused by the accident might have been one of the contributing factors for not having made such a charge. Maxcey further testified that the steamship company's agent, Biehl & Co., was one of their customers. It was Biehl & Co., Maxcey said, that called Danner's and asked them to perform the services; that they had "performed services of that nature before for aliens" and that they knew that Captain Burmester was an alien. He said that in some instances a charge was made, in others it was not. It was according to the situation, and if it wasn't too much trouble and if they felt it was good public relations they wouldn't make a charge for it. He testified further that he had gone to the airport first to pick up the relief captain for this ship who was to be taken there when appellee left it, and that, combining the two together, he would say they "ordinarily would have charged for it."

■ As stated by the Supreme Court in Cedziwoda v. Crane-Longley Funeral Chapel, 283 S.W.2d 217, 218: "The purpose of Article 6701b is to prevent fraudulent collusion between an insured and a guest." In that case the plaintiff was accompanying his fiancé at her request to the hospital in an ambulance with the knowledge of the driver when it collided with another vehicle. He sued the owner of the ambulance to recover damages for injuries sustained in the collision which were proximately caused by the negligence of the driver. It was undisputed that his fiancé had been charged $5.00 for the trip, which included her transportation with a friend or a relative. The Supreme Court held he was not the guest of the owner or operator of the ambulance without payment for transportation, within the terms of Article 6701b, V.A.T.S.

In Johnson v. Smither, Tex.Civ.App., 116 S.W.2d 812, 814, error dismissed, it was likewise held, as a matter of law, that the appellee was not a guest within the terms of Article 6701b while she was in the appellant's car for the purpose of pointing out to him the way to her farm which she had listed with him for sale as a real estate agent so that he could show it to prospective customers. In so holding, the court said: "We have concluded that under the facts of this case and under what we consider a proper construction of the statute, Mrs. Smither was not a guest."

Appellants Danner have cited the cases of Burt v. Lochausen, Tex.Civ.App., 244 S.W.2d 915, affirmed 151 Tex. 289, 249 S.W.2d 194, and McCarty v. Moss, Tex. Civ.App., 225 S.W.2d 883, error refused. In both of these cases if any benefit could have accrued to the owners of the automobiles, it was entirely too remote to remove them from the terms of Article 6701b, V.A.T.S.

■ In the case under consideration, it is apparent that a charge would have been made to the steamship company for transporting the two captains through the agent, Biehl & Co., if there had been no accident. In fact, no other construction can be placed upon the testimony of appellant Maxcey.

We, therefore, hold that under the undisputed testimony of an interested party Burmester was not a guest in Danner's automobile, and therefore Article 6701b,

V.A.T.S., is in no wise applicable. The foregoing point is therefore overruled.

■ By appropriate points Marina Mercante Nicaraguense, S. A., has assigned as error the action of the trial court in denying it a recovery against all appellants in the sum of $8,190, being the amount of the medical care, hospital bills, and reasonable maintenance paid by it under maritime law to appellee Burmester between December 23, 1954, and the date of the trial.

Intervenor bases its contention primarily upon the holding in the case of Jones v. Waterman Steamship Corporation, 3 Cir., 155 F.2d 992, 997. In that case, Jones, a seaman, who was injured while on shore leave in Pennsylvania, brought suit against his ship owner Waterman for maintenance, cure, and wages. By a separate action in tort, he sought a recovery of damages against the Reading Company, the owner of the pier on which he was walking when injured. Jones settled his suit with Reading, giving a general release. Waterman impleaded Reading in the suit asking indemnity for any sum Jones might recover from Waterman. The Third Circuit Court held that Waterman could recoup from Reading if Reading was at fault to the extent of those amounts which Waterman would have to pay for maintenance and cure. In reaching this conclusion the court reasoned that, "If Waterman can recover from Reading it can do so because a cause of action arises under the law of Pennsylvania where the operative facts occurred. No Pennsylvania case in point has been cited to us and we can find none." It then discussed the "general law" followed by Pennsylvania permitting an employer the right to recover from a tort-feasor the value of the services of his injured employee lost by reason of the tort-feasor's negligence, and the right of a property owner to recover indemnity from a tort-feasor whose primary negligence has caused him to pay damages to an injured party. The court then concluded: "We think that under these circumstances *the law of Pennsylvania* will permit Water-

man to recover not only for the loss of Jones' services but for the sum which it will be compelled to expend for his maintenance and cure." (Italics ours).

In Federal No. 2, 21 F.2d 313, decided by the Second Circuit Court, before the Jones case, a libel was brought by a barge owner to recover the maintenance and cure expense paid a seaman employed by the libelant when injured by the negligence of respondent's tug. A recovery was denied libelant on the premise that its obligation to its seaman employee was contractual and respondent's liability arose in tort only, which constituted no breach of any duty owed libelant, although the seaman could maintain a tort action against respondent for his personal injuries.

Each of these cases has been cited and followed in other jurisdictions, and although reaching opposite results, strangely enough they are based on identical reasoning. In each case the court recognized the fact that the laws of the state in which the injury occurred were applicable. In the Jones case the court held that under the "general" law which was found to be applicable in Pennsylvania, the ship owner was entitled to be subrogated to the rights of the employee upon payment of wages, maintenance and cure; whereas, in Federal No. 2 the Second Circuit Court held that the law of the forum where the seaman's injury occurred did not recognize any such right of subrogation and denied the employer a recovery against the tort feasor.

In Standard Oil Company of California v. United States, 9 Cir., 153 F.2d 958, affirmed in 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067, a soldier in the United States army was injured by the Oil Company's truck in a traffic accident. Suit was brought by the Government against Standard Oil to recover the cost of the soldier's hospitalization and the wages paid him during the time of his disability. The District Court allowed the recovery but its judgment was reversed by the Ninth Circuit Court, wherein it was held that in the

absence of Federal statute the state law, being California in that instance, applied and that the right of action in favor of the indemnitor did not exist either under the California Code or at common law.

Intervenor contends that the Third Circuit Court reached the correct decision in Jones v. Waterman Steamship Corporation, supra, but employed "questionable" reasoning in holding that the local law was applicable rather than the general maritime law as establishing the right of indemnity. This of course goes to the heart of the question because in arguing that intervenor should recover against Belt and Danner as joint tort feasors the amount paid by it to Burmester as maintenance and cure, it only finds support for the right of indemnity under general maritime law.

We have been cited no authority holding that the general maritime law has been recognized as being applicable in Texas and we know of none. In the absence of any such authority, we believe that the ruling in the case of Morgan v. Woodruff, Tex. Civ.App., 208 S.W.2d 628 (no writ history) is pertinent. In that case it was held that in the absence of an assignment to the Government, one of its injured employees who had received compensation payments and medical and hospital benefits under the United States Employees' Compensation Act, 5 U.S.C.A. § 751 et seq., could prosecute his suit against the tort feasor without the necessity of the United States joining in the action. In so holding the following statement from Standard Oil Company of California v. United States, supra, was quoted: "It is held that in the absence of contractual or statutory right, the party paying wages and medical expenses is not entitled to subrogation or indemnification." [Tex.Civ.App., 208 S.W.2d 631.]

Some significance must be attached to the fact that our court gave considerable weight to the opinion of the Ninth Circuit Court of Appeals in Standard Oil Company of California v. United States, supra. Moreover, the decisions in the cases of Federal

No. 2 and Standard Oil Company of California v. United States, supra, are based upon identical reasoning although Federal No. 2 was not cited in the later case.

This conclusion is also supported by Aetna Life Ins. Co. v. J. B. Parker & Co., 96 Tex. 287, 72 S.W. 168, 580, 621, holding that an insurer against accidents is not entitled to be subrogated to the insured's rights against the person whose negligence caused the injury.

Intervenor also assigns as error the refusal of the trial court to award it judgment against Danner for the amount of $8,190.00 paid under the maritime law for hospitalization, maintenance and cure by reason of Danner's breach of its implied contract with intervenor for the safe carriage of Burmester.

As we understand the law, the rule of damages applicable to Intervenor's action against Danner on the theory of a breach of the contract of carriage as a result of negligence would be the same as in tort. In El Paso & N. E. Ry. Co. v. Landon, 58 Tex. Civ.App. 397, 124 S.W. 744, 746, writ ref., in passing on this question it was said:

> "We overrule the second * * * assignment of error, upon the authority of [El Paso & N. E. R. Co.] v. Sawyer, [56 Tex.Civ.App. 195,] 119 S.W. 107, and for the reason that the damages recoverable for the breach of the contract of carriage resulting from a derailment are the same as are recoverable in an action of tort on the same facts, and that the defendants' liability is subject to the same rules and may be established by like testimony and presumptions as in cases of torts."

■■ At common law, as we have heretofore discussed, the employer in his action against a tortfeasor for injuries to his employee is limited to a recovery of damages measured by the loss of services. This, therefore, is the same rule of damages applicable to intervenor as against

Danner under the breach of the contract of carriage theory.

For the reasons above set forth, intervenor's assignments of error assailing the action of the trial court in refusing it recovery of any of the items of maintenance and cure, both past and future, against Belt and Danner, are overruled together with its claimed error by the trial court in refusing to provide that the recovery of the $5,450 for future hospital expenses, medical care and maintenance should also be made in intervenor's favor as against the appellants but for the use and benefit of Burmester.

Appellants also contend that the verdict of the jury was so grossly excessive as to show the jury was influenced by passion or prejudice and that it must be set aside and this cause reversed and remanded.

That the appellee, Kurt Burmester, suffered severe, painful, and disabling injuries as the result of this accident cannot be questioned. The proof showed that his right foot and ankle were broken, his right knee was injured, and his right hip was broken. He likewise sustained serious injury to his lower back and a fracture of six to eight ribs on the left side. In addition thereto he suffered some lung damage as a result of scar tissue that formed during an attack of pleurisy and traumatic pneumonia. In addition his hand was injured and his head was bleeding after the accident. He was in a cast until the first part of February, 1955. He was not able to get out of bed and sit in a wheelchair until April of 1955, and later in the same month he started using crutches for the first time.

During the first eight to ten days after the accident he was given "shots" to ease his pain. He then started taking six to eight aspirin a day. He had severe headaches until July, and in December, 1955, at the time of the trial, he continued to have headaches which would last two or three days. He testified that his hip was hurting him constantly and when the weather changed the pain was very severe.

Dr. Philo Howard first started treating appellee on February 11, 1955, when he had traumatic pneumonia and pleurisy on the left side, fractures of the ribs and headaches from a skull fracture concussion. He was also very depressed. In about sixty days the pneumonia and pleurisy cleared up, leaving plural adhesions which make a person more susceptible to lung complications. Burmester overcame his mental depression, which he had suffered as a consequence of the accident, in · about six weeks, and before the trial had walked a little with a cane assisted by a physiotherapist in the hospital. He was going regularly, at the time of the trial in December of 1955, for physiotherapy treatments. Dr. Howard testified that Burmester's condition was improving to some extent and that he thought he could be a bookkeeper or do something of that type that didn't require too much physical effort. He did not think that he could "pass appellee" as being physically qualified for employment as a captain on a ship.

Dr. Arthur Glassman, an orthopedic surgeon, called as a witness for appellee, stated that he started treating appellee February 9, 1955. He testified that Burmester sustained numerous fractures of the right foot and ankle, a compression or wedging of the last or fifth dorsal vertebra, a displacement of the head of the femur which had "knocked out" a triangular piece of bone which holds the hip joint in position, thus resulting in the narrowing thereof. He stated that the "cup" of the hip had been fragmentated, with roughening and thinning of the cartilage. He testified, too, that immediately after the accident appellee was in severe pain; that after he saw him in February or March, 1955, he was having moderate pain and that appellee had suffered pain of some kind since he was hurt, although when he attempts to walk or is given physiotherapy he has more pain. When he is resting in bed he has relatively little pain, the doctor stated. Dr. Glassman further testified that appellee, Burmester, to the date of the trial had been wholly unable

to pursue any occupation requiring any degree of physical or manual effort on his part. He also stated that appellee should get physiotherapy for another six to eight months to build up his muscles and to maintain his muscles in his hip so he can resume walking, the object being to get him off of crutches and get him walking around with a cane. He testified that in six to eight months Burmester should be off of crutches and able to walk some distance with a cane. The doctor discussed the possibility of necrosis or the wasting away of the head of the femur, which might require an operation and a prosthesis or insertion of a metallic ball in place of the femur in an effort to make a hip joint. He estimated that the chances were "about 50-50" that he would have to have this operation. In such event he should have a good operating hip for five or six years without pain, but following that the doctor said he could not predict. It would require hospitalization for two or three months and the expenses and doctor bill would be from $1,500 to $2,000. He further testified that it would be four or five months before it could be determined whether the operation would be necessary. While appellee would have some thickening in his foot, he would have one he could use. He would not be able to run and would have some pain in the ankle.

The doctor stated he didn't know whether Burmester would have permanent pain or not. If he attempts to use his leg, he will have some discomfort but how much pain a person is going to have one cannot tell. But, he will have difficulty in not being able to get around. He also stated that he couldn't "rightfully" predict how much discomfort he would have on changes of the weather.

Appellee Burmester testified he started going to sea at fourteen years of age, first as a ship's boy, then as an ordinary sailor, four years as a ship's man, and after going to navigation school he went to sea as a 4th officer on a ship sailing between Africa and Germany. At twenty-six years of age he went to school again and qualified for a captain's license. He returned to the position of 2nd officer with the company for which he had worked, and served until 1932 when he lost his job as a result of the economic depression. He was then on relief. As business began to improve in the late '30's he became a captain on a whaling vessel earning as much as $14,000 per year. In 1940, when war was declared, he was in the German army where he remained until 1945. From 1945 to 1947 he was unemployed. In 1948, as West Germany began to emerge from the effects of the war, he started a guard service for railroads which failed a short time thereafter; and, from 1949 through 1952 he was employed by the Hamburg Ship & Cargo Watching Service in which he served as a relief captain on ships coming into Hamburg. While employed in this capacity, he supervised the loading, unloading, cleaning, and supplying of ships, and earned about $150 a month.

In 1953 he returned to the sea and went to work as a 2nd officer on the "Leada" of the Mameric Line. The record is rather vague as to what his salary was, but as second officer it was less than $300 per month. He left the Leada and was told he would be made the captain of the "El Salvador." In this position, he testified, he was to receive $500 per month and his subsistence, which Burmester valued at $150 per month. It seems, however, he was not to become the captain of the El Salvador until about March of 1955, and in the meantime he sailed as its 2nd officer to Nicaragua. There he took the captaincy of the ship "Rio Escondito" for $300 per month, with the condition that he was to keep it only until he reached Houston. At the time he was injured he had just left the Rio Escondito enroute to New York to resume the position of 2nd officer on the El Salvador.

Appellee was fifty-four years of age at the time he was injured, and had a life expectancy of 18.41 years. He testified to his good health before his injury and declared that he would have been "a good

captain" for twenty years if he had not been injured.

In view of the size of the verdict in this case, we have endeavored to set forth a résumé of the evidence relating to the extent and nature of the injuries sustained by appellee, his physical pain and suffering, and mental anguish both past and future, as well as his loss of earnings to the date of trial, and loss of earning capacity in the future.

Appellants cite World Oil Co. v. Hicks, Tex.Com.App., Sec. B, 103 S.W.2d 962, and Dallas Railway & Terminal Co. v. Farnsworth, 148 Tex. 584, 227· S.W.2d 1017, in urging that the amount of the verdict, when considered in the light of the evidence, is so excessive as to warrant the conclusion here that it was the result of passion or prejudice or other improper motive without the necessity of extraneous proof.

While we recognize the full import of this rule, after carefully reviewing the testimony, we do not believe that the jury's verdict awarding appellee Burmester the sum of $160,000 in response to Special Issue No. 37, involving the elements of damage above set forth, is so grossly excessive that it manifests such passion or prejudice on the jury's part which requires a reversal of this case, and therefore appellants' points of error seeking a reversal of the trial court's judgment and a remanding of the case on that ground are accordingly overruled.

However appellants further contend that the verdict of the jury was so excessive that as a matter of law the court erred in entering judgment thereon without requiring appellee to file a remittitur.

Their position is that the verdict was so clearly excessive that if it is not found to have been motivated by passion or prejudice, it was the result of a disregard for the evidence and an abuse of discretion in returning an amount so large as to exceed any compensation a jury could have reasonably allowed and consequently a remittitur should have been ordered by the trial court under Rule 440, T.R.C.P. We believe this point is well taken. The amount of the verdict itself is sufficient to warrant such conclusion without the necessity of extraneous proof. Dallas Railway & Terminal Co. v. Farnsworth, supra, and World Oil Co. v. Hicks, supra.

We, therefore, as a reviewing court, are confronted with the problem of determining the amount of the verdict which is unwarranted and excessive.

In a similar situation in the case of Port Terminal Railroad Association v. Noland, Tex.Civ.App., 288 S.W.2d 276, 283, writ ref., n.r.e., Chief Justice Hamblen, in ordering a remittitur of $30,000 on a $79,400 judgment stated:

"There is almost no yardstick which may be employed which will remove the decision from the realm of pure subjective thinking. The only objective approach to the problem of which this Court is aware is that of comparing the award made with those which have been approved by other courts in comparable litigation."

In writing on the same subject in the case of Kimbriel Produce Co., Inc., v. Webster, Tex.Civ.App., 185 S.W.2d 198, 202, writ ref., w. m., Associate Justice Norvell, now a member of our Supreme Court, said:

"The record of the evidence here undoubtedly supports the award of a large sum of money as damages. The determination of the amount rests primarily with the jury, and there is no set formula applicable to cases of this character wherby the exact amount can be measured or ascertained. The amount of the award is not, however, free from control or revision by either the trial court or this Court. 'The doctrine is now generally accepted that the verdict of the jury is subject to the supervision of the court whether

such verdict is too large or too small.' 15 Am.Jur. 620. 'Precedents are helpful and of some value in determining whether damages awarded for similar personal injuries are or are not excessive or inadequate,' 25 C.J.S. Damages § 198, p. 914, although it be conceded that no two injuries are alike in all particulars and do not have the same consequences or results insofar as damages are concerned. It is recognized that 'there should be a reasonable uniformity as to the amount of verdicts and judgments in the various cases.' McNatt v. Wabash Ry. Co., 341 Mo. 516, 108 S.W.2d 33, 43."

At the outset the observation should be made that we have found only one case among all the Texas appellate court decisions disclosing a jury verdict in a personal injury suit for an amount in excess of $100,000, that being Porter v. Puryear, Tex.Civ.App., 258 S.W.2d 182. This was a malpractice case which was reversed on other grounds without any mention being made of the excessiveness of the verdict.

Only one personal injury case involving the question of excessiveness has been found where the verdict was for more than $85,000, and that was the case of Louisiana & Arkansas Ry. Co. v. Robinson, 302 S.W.2d 665, 667, writ ref., n. r. e., by the Texarkana Court of Civil Appeals, wherein a verdict for $100,000 was permitted to stand, and which point was disposed of thus:

"The other point assigned by appellant in its brief is that the jury verdict and judgment of the trial court is excessive. Even though we hold that the point has not been properly preserved, we have carefully examined the record in this case, and without extensively discussing the evidence, we find the point to be without merit. The age of appellee, 31 years, with an annual income of about $6,000 per year and a life-expectancy of 36 years, coupled with the medical testimony and jury findings, fully support the amount of the judgment."

In Thompson v. Barnes, Tex.Civ.App., 236 S.W.2d 656, no writ history, this Court held that an award of damages by the jury of $85,000 to a 53 year old railroad conductor in an action under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., for past and future loss of earnings, physical pain and mental anguish as a result of injuries to his back was not excessive.

In Texas & Pac. Ry. Co. v. Crown, Tex. Civ.App., 220 S.W.2d 294, writ ref., n. r. e., an award of $50,000 to a carpenter who was 22 years of age at the time of the accident, resulting in the loss of one leg four inches below the knee and the loss of the other leg seven and one-half inches below the knee, was held to be excessive by $12,500 requiring a remittitur of that amount, although it should be observed that at the time of trial he was earning twice as much money as at the time of injury.

Also in Henwood v. Moore, Tex.Civ. App., 203 S.W.2d 973, an action by a 24 year old brakeman with a life expectancy of 39½ years, earning a gross monthly wage of $270, who received injuries to his head and right shoulder, necessitating several blood tranfusions and causing an unconscious condition for a week coupled with atrophy of the muscles in his right shoulder, the impairment of his hearing, the inability to lift his arm for several months higher than on a level parallel with the floor, and at the time of trial he still suffered pain in his head, it was held that $35,000 was excessive by $15,000, requiring a remittitur of that amount.

In Gillette Motor Transport Co. v. Whitfield, Tex.Civ.App., 197 S.W.2d 157, affirmed 145 Tex. 571, 200 S.W.2d 624, an award of $44,000 to a brakeman on a railroad for very serious injuries was held to be so clearly excessive as to indicate that it was the result of passion, prejudice, or

corruption or. that it was clear that the jury disregarded the evidence, necessitating the requiring of a remittitur of $12,-500.

In Thompson v. Robbins, Tex.Civ.App., 297 S.W.2d 247, affirmed 304 S.W.2d 111, a judgment based upon a verdict for the plaintiff for $75,000 was affirmed in the case of a 56 year old brakeman with a life expectancy of 17.1 years, earning for two months prior to his injury an average of $533.80, and from which injury he suffered total and permanent disability to work.

Again, in Texas Mexican R. Co. v. Bunn, Tex.Civ.App., 264 S.W.2d 518, writ ref., n. r. e., a realtor who was 29 years of age making about $7,400 a year at the time of his injury was awarded $82,200 including hospital, nurses and doctor bills. It was held that that part of the verdict constituting about $80,000 awarded for personal injuries, loss of earnings and earning capacity, was not excessive in view of his severe injuries consisting of a brain concussion almost causing his death, and which rendered him unconscious for days, a crushed right shoulder which had to be fastened together with metal pins and wires, the upper arms being rendered practically motionless, and the lower arms' movement being restricted to the elbow. In addition thereto his left leg was fractured in four places, so that a steel pin or rod had to be inserted in the hollow parts of the femur and the same placed in a cast in order to hold it together. According to the medical testimony, there was a probability that the rod would have to be removed. The legs were no longer of equal length and it was necessary for appellee to use a crutch.

The claimant Bunn in that case also testified that he was experiencing severe throbbing headaches, presumably from the brain concussion, and that he had continuous pain in his leg, back and particularly the upper part of his shoulder. He stated that he was extremely nervous, had difficulty in sleeping and it was necessary to take sedatives to obtain relief.

By comparing the statement of the nature and extent of the injuries there involved with those in the case at bar, which we have endeavored to set out in detail in an earlier part of this opinion, the similarity of the injuries suffered by appellee in that case and the appellee Burmester in this case here is striking, with the exception that the injured party Bunn in the case cited was some 15 years younger than appellee Burmester at the time of injury.

The case of Kimbriel Produce Co. Inc., v. Webster, Tex.Civ.App., 185 S.W.2d 198, 202, writ ref., w. m., is worthy of consideration especially in connection with the elements of damage present therein which consisted of physical pain and suffering and mental anguish, both past and future. In that case an award in the amount of $46,000.00 was held to be excessive although the injuries required hospitalization for one year, and resulted in brain concussion, disfiguring scars, and a deformed leg and ankle necessitating the use of crutches and preventing him from sitting in a normal position. The severity and permanent nature of the injuries involved were recognized by the courts in two instances in the opinion as follows:

"The record of the evidence here undoubtedly supports the award of a large sum of money as damages. * * * We regard the record as presenting an extreme case of past and probable future physical pain and mental suffering."

As we have endeavored to demonstrate by stating at length the substance of the pertinent testimony, appellee's injuries to his back and hip were indeed very grave, painful and serious, and were of such a nature that he will be totally and permanently disabled from ever doing any work aboard a ship, although it is possible that eventually he may do some very light work as suggested by the testimony of his

physician, Dr. Philo Howard. This, however, is by no means certain. It must also be said that in all probability he will experience pain and suffering over a considerable period of time, and there is also the possibility of his having to undergo additional surgery on his hip. No doubt his foot will be stiff.

After an exhaustive study of many authorities and a careful weighing of all the testimony in this case, conceding the severity of the injuries, the attending disability, and pain and suffering, nevertheless we are constrained to hold that the verdict of $160,000 in response to Special Issue No. 37 exceeds a rational appraisal and estimate of the damages by $40,000.

The judgment of the trial court, therefore, will be affirmed if the appellee, Kurt Burmester, will file in this Court within thirty days from date hereof a remittitur in writing of $40,000; otherwise, said judgment will be reversed and the cause remanded for a new trial.

### Supplemental Opinion on Filing of Remittitur

On November 21, 1957, this Court by its opinion suggested that if appellee, Kurt Burmester, would file in this Court a remittitur of $40,000 within thirty days from said date, said judgment would be affirmed; and, it now appearing that on November 25, 1957, said appellee filed such suggested remittitur, and thereafter filed a motion protesting that the judgment of the trial court was not excessive and moving that he be permitted to file a motion for rehearing, asserting that the remittitur should not have been suggested;

Accordingly, as of this date, the judgment of the trial court is reformed by deducting the amount of $40,000 from the judgment recovered by the appellee, Kurt Burmester, and, as so reformed, is affirmed.

One-fourth of the costs of this appeal will be taxed against appellee, Kurt Burmester, and three-fourths against the appellants.

Motion for rehearing may be filed by any of the parties within fifteen days after this date.