**SOUTHERN TRUCK LEASING COMPANY,**
Inc., et al., Appellants,

v.

Russell T. MANIERI, Jr., et al., Appellees.

No. 13337.

Court of Civil Appeals of Texas.

Houston.

June 18, 1959.

Rehearing Denied July 23, 1959.

Arthur D. Dyess, Jr., Craig C. Cantey Jr., Houston, Dyess, Dyess & Prewett Houston, of counsel, for appellant.

J. Curtiss Brown, W. W. Watkins, W James Kronzer, Houston, Hill, Brown, Kronzer & Abraham, Houston, of counsel, for appellee, Russell T. Manieri, Jr.

John L. McConn, Jr., Houston, Butler, Binion, Rice & Cook, Houston, of counsel, for appellee, Griffin Wellpoint Corporation.

WERLEIN, Justice.

Southern Truck Leasing Company, Inc., sued Russell T. Manieri, Jr., and his employer, Griffin Wellpoint Corporation, to recover damages to its truck and trailer, and Walter L. Rhoden, driver of the truck, also a party-plaintiff, sued to recover damages for personal injuries. Plaintiffs alleged that their respective damages resulted from a collision between such truck and a Lincoln automobile driven by appellee, Manieri, on August 31, 1955, about nine miles west of Dayton on Highway 90 in Harris County, Texas. Manieri, acting by his next friend, Mrs. Russell T. Manieri, Sr., filed in the same cause an amended petition by way of cross-action against appellants, Southern Truck Leasing Company, Inc., Falstaff Coastal Distributing Company, Inc. and Walter L. Rhoden, to recover damages for personal injuries sustained by him in said collision. On the verdict of the jury the Court entered judgment for Manieri against Falstaff Coastal Distributing Company, Inc. and Rhoden for $140,396.16, and a take-nothing judgment was entered as to the remaining parties on the causes of action asserted by them.

Appellants complain by their First Point that the Trial Court erred in not

granting them a new trial, because the juror, Mrs. Howell, on voir dire examination misled appellants, to their probable damage, and was not an impartial juror. On the hearing for new trial, the evidence showed that she had been in an automobile accident two years and two months prior to such examination.

Mr. Dyess, counsel for appellants, in examining the jurors on voir dire, asked:

"Now, has any one of you ever had a claim for personal injuries to yourself or a lawsuit at any time in the past? And by 'claim', I mean, have you ever been hurt and asserted that someone else was responsible for it and sought damages of the injury that you felt you received?"

and also the question:

"Has anyone else among you had a claim for damages for any kind of injuries you received in the past? All right, other than Mr. Beard, who spoke up, I take it that none of the balance of you has had that happen."

Mrs. Howell did not make any answer to either question. Mr. Brown, counsel for Manieri, in interrogating the panel, asked:

"Now, he asked you a series of questions as to whether or not you had ever had any claims, for damages. Now, that is a rather broad question and is subject, possibly, to misconstruction, in my mind, and perhaps, as well, in your mind. I do not know whether he intended to rule out a person that may have been injured on the job and got some little hospitalization or some little payments, compensation payments, or things of that kind, or not. But in order to be on the safe side, because it's necessary that everybody speak up on any questions that they are asked on this examination, in order to be on the safe side, and for there not to be any misunderstanding or error about it, has anybody ever been hurt on the job at all? Say, just a finger?"

Several hands were raised and the following occurred:

"Mr. Brown: Several of you, some six or seven of you, held up your hands.

"Mr. Head: Lost time injuries?

"Mr. Brown: Not even lost time, just any kind of injuries that you may have received that it might have gone down on the record, Mr. Head, that you might have gotten some hospitalization or some payments.

"Mr. Head: I guess anybody that has worked has.

"Mr. Brown: Well, I would imagine so. Well, so far as my purpose is concerned, about eight of you held up your hands, and that is about all I need to know about it. And if Mr. Dyess wants to go into it further, he can do so."

On the hearing of the motion for new trial, Mrs. Howell testified that she had never had a claim for personal injuries to herself, or a law suit, and never had filed a claim for damages for any kind of injuries received by her; that she had been in an automobile accident and her automobile suffered damage and her neck was hurt a little bit but it was not serious; that she remained in the hospital seven days on recommendation of her doctor, after which she went home and took care of her four boys and her house; that the accident had not hurt her any. She further testified, "There wasn't any claim." Someone contacted her after she went home and offered to pay for damages to the car and her injuries and hospital $600 and some odd dollars; that she and her husband did not submit any counter offer or ask for any more; that they took the amount offered and were pleased with it because they did not expect to get that. She also testified that the accident did not influence her thinking in any way while she was a juror; that she had trouble only about two weeks after her automobile accident and

made a complete recovery; that she recalled that Mr. Dyess asked if the jurors or any member of their family had ever filed a claim, and that she did not respond because she had not filed a claim, and that she did not understand that he was asking her if she had ever asserted a claim against anybody, but that when Mr. Brown got up and explained or asked questions "about injuries and all," she held up her hand; that no one asked her anything about it after she raised her hand and that if they had she would have told them about the accident and the minor injuries that she had received. Counsel for appellants did not ask any questions concerning any injuries after appellee's counsel had finished questioning the jury.

Appellants contend that it is immaterial whether Mrs. Howell acted in bad faith. Their contention is that under Rule 327, Texas Rules of Civil Procedure, they were probably injured because the defense was misled by Mrs. Howell's answers on voir dire, and were deprived of the opportunity to use a peremptory challenge which they feel certain they would have used, and further that the verdict is not that of a properly constituted tribunal since the juror, Mrs. Howell, violated her oath as a juror and did not answer the questions truthfully. They cite several cases, including Texas Employers' Ins. Association v. Wade, Tex.Civ.App., 197 S.W.2d 203, writ ref., n. r. e.; Traders & General Insurance Co. v. Cossman, Tex.Civ.App., 212 S.W.2d 865, writ ref., n. r. e., and Dallas Ry. & Terminal Co. v. Kurth, Tex.Civ.App., 247 S.W.2d 930, writ ref., n. r. e.

The rule established in those cases, holding in substance that if any uncertainty existed as to the effect of a juror's failure on voir dire examination to disclose material information, a new trial should be granted the complaining party because of having been deprived of a properly established tribunal, was in effect abrogated by Childers v. Texas Employers' Ins. Ass'n, 154 Tex. 88, 273 S.W.2d 587, 588. In that case the Supreme Court held:

"The failure of the juror on his voir dire examination to disclose information that he had suffered previous injuries is not the test to be applied in this case, unless the evidence shows that he concealed the fact of previous injury, as alleged in the motion for new trial, and that such action resulted in probable injury to the respondent. Rules 327, 434 and 503, Texas Rules of Civil Procedure."

We are of the opinion that appellants have failed to show that Mrs. Howell's failure to understand the question of Mr. Dyess and hold up her hand at that time resulted in any probable injury or prejudice to them. Mrs. Howell did raise her hand when she understood that the inquiry covered not only claims that were being asserted and controversies, but also included any injuries sustained in any accident. Moreover, the manner in which Mrs. Howell's accident was settled, the nature and duration of her injuries, her satisfaction with the settlement, and her testimony on the hearing of the motion for new trial, refute rather than support appellants' contention that Mrs. Howell was not an impartial juror and that her service on the jury probably resulted in injury or prejudice to them. See Thompson v. Quarles, Tex.Civ.App., 297 S.W.2d 321, writ ref., n. r. e.; Houston Belt & Terminal Railway Co. v. Burmester, Tex.Civ.App., 309 S.W.2d 271, writ ref., n. r. e.

■ Appellants' Second Point asserts that the Trial Court erred in excluding records showing that one Johnny Armstrong, in an action brought by the State Bar Grievance Committee, had consented to the entry of an order enjoining him from acting as a runner for lawyers.

Appellants contend that such records offered for impeachment purposes were evidence of the illegal manner in which the witness, John Armstrong, earned his livelihood and a circumstance which the jury could believe would bias him in behalf of whichever party his testimony helped. The witness testified by deposition taken by ap-

pellants that he worked as a labor-gang leader at Sheffield Steel Corporation and had been with Sheffield Steel six years and three months. There is nothing in his testimony to show that he ever engaged in any other employment, or that he was the same person as Johnny Armstrong, one of the defendants in the Grievance Committee suit. The only evidence bearing on identity was the testimony of one of appellants' attorneys, who stated that he "understood" that they were the same person and "believed" that the witness was one of the defendants in said proceeding. Appellants admitted that they could not prove that the witness had been employed by appellee's counsel or by appellee.

■■■ A witness may be impeached by showing of interest, bias, prejudice or motive which tends to affect his credibility in the particular case. 1 McCormick and Ray, Texas Law of Evidence, Secs. 670, 678, pp. 514, 520, 521. There was no evidence of any demeanor, conduct or testimony on the part of John Armstrong which manifested any bias or prejudice or interest in the present case, thus distinguishing it from the case of Traders & General Insurance Co. v. Diebel, Tex.Civ.App., 188 S.W.2d 411, writ ref., w. o. m., relied on by appellants. If we assume that Johnny Armstrong and witness, John Armstrong, are the same person and that he had engaged illegally in the solicitation of professional employment for attorneys, there is still nothing in the excluded records nor the record of this case to indicate that he solicited the present case for anyone or that his conduct, though reprehensible generally, was related to or would influence his testimony in the instant case. Even in the case of a personal injury litigant, it is not proper to show that he is claims-minded in an effort to attack his credibility, since the slight probative value of such evidence is outweighed by the danger of unfairly prejudicing the claim of an innocent litigant. Martinez v. Williams, Tex.Civ.App., 312 S.W.2d 742, 752, no writ history; McCormick and Ray, Texas Law of Evidence, Vol. 2, p. 375.

■ Further, appellants never interrogated the witness with respect to any alleged bias or interest, and laid no predicate for the admission of impeachment evidence. As stated in McCormick and Ray, Texas Law of Evidence, Vol. 1, Sec. 680, p. 523:

"Where the evidence consists of conduct or circumstances there seems to be no good reason for requiring a preliminary inquiry and it is not required in criminal cases. *Yet the civil courts have consistently held that the foundation must be laid.*" (Emphasis ours.)

See Whitfield v. Traders & General Ins. Co., Tex.Civ.App., 136 S.W.2d 626, 627, no writ history.

■ Appellants' Third Point is that "the findings of the jury on the liability issues are not supported by the greater weight and preponderance of the credible testimony." This Court has had some difficulty in trying to determine just exactly what such Point embraces. In their amended motion for new trial appellants took the position that "the verdict is not supported by the evidence," because there is no evidence that Rhoden drove the truck onto the left half of the roadway, or failed to keep a proper lookout, or operated the truck at an improper rate of speed. If a verdict is not supported by the evidence, it is because there is an insufficiency of evidence. Therefore, appellants' assignment and Point may be construed as a left-handed assertion that the findings of the jury on the liability issues are against the great weight and preponderance of the evidence.

There is a direct conflict in the evidence of appellants and appellee as to how the collision occurred. The testimony of appellants' witnesses, L. E. McGee and appellant, Walter Rhoden, indicates that Rhoden was driving the truck in an easterly direction in the south lane of traffic. McGee testified that just before the truck was abreast of his automobile, which he was driving in a westerly direction, he saw the lights of a car to his rear move out as if to

pass his car. Some two, three or four seconds passed before he heard the crash. He did not see the collision. He made a U-turn and went back to the scene and noticed the Manieri car on the south side of the highway facing more towards Dayton than Houston. The truck had crossed the highway before coming to a rest on the north side of the highway.

Rhoden testified that he was traveling between 40 and 45 miles per hour; that the Manieri car appeared to be moving slowly to his (Rhoden's) right across the highway; that he did not change the direction of his truck before the impact; that just before the impact the Manieri car was crossways on the highway and on his, Rhoden's, side of the road; that he did not have time to apply his brakes, and that with his lights on dim he could see about 100 feet at the most.

The negligence issues found against the appellants were: Rhoden's failure to keep a proper lookout; driving the truck onto the left one-half of the road; failure to keep the truck under proper control, and operating the same at an improper rate of speed. The jury further found that Rhoden was not acting in an emergency situation but Manieri was, and that Manieri kept proper control of his vehicle, and stayed on his side of the center line and kept a proper lookout.

While it is true that appellee Manieri's brain injury was of such severity as to damage his mental faculties, and that upon cross-examination he admitted he could not remember whether he was following another vehicle immediately before the collision (notwithstanding his deposition testimony to the contrary), he did testify that he remembered the accident. He further testified:

"I didn't know it was a truck. I didn't see the clearance lights. I saw two headlights, that is all. It could have been a car or anything. I don't know. But I saw them coming down (indicating). I don't know whether it was the wrong side of the road, or not,

but it was almost on the wrong side of the road. I didn't think I had enough room. So, I moved over to the right. I hit the shoulder of the road. And I remember the impact, too, the impact. And I remember telling DeMoss that we didn't have much room, before the impact."

The evidence further showed that Rhoden had been on the road some eight or nine hours and had no helper, during which time he made no more than four stops and had very little to eat or drink. Rhoden further testified that before the collision he met a string of cars, and that he did not see the headlights of any of them pull out as if to pass, thereby in effect admitting that he never saw the lights on the Manieri car. He stated that he did not see the Manieri car until he was some 20 or 30 feet from it, and then he had the impression that it was crossing slowing across the highway from a north to a southerly direction. He also admitted that he did not have his windshield wiper working at the time, and that it was not raining right at that moment. Others testified that it had been raining. The evidence showed that although Rhoden was traveling in an easterly direction on the south side of the highway, his truck ended up on the north side of the highway and that he traveled at least 200 feet after he hit the Manieri car until he came to a stop off the highway on the soft muddy shoulder.

John Armstrong testified by deposition that he followed the Manieri car from Dayton up until the time of the collision; that it was pouring down rain; that the headlights of the Lincoln were both shining when it passed in front of him at Dayton, where he stopped for gas, and that its taillights continued to burn. When asked how the accident happened, he stated:

"Now, as near as I could see—in that, you would go by the lights, when you are driving down the road—it seemed to me the lights on the truck had done got over on the car, on the Lincoln's side; it was comin' you know, just

like this (indicating) over on the Lincoln's side, and it appeared to me that the man that was driving the Lincoln had pulled off, you know, pulled off the road to miss him, and when he pulled off, he must have dropped off the shoulder and he seemed to give his car a quick jerk, or maybe because he dropped off, caused it to jerk, and when he done that, he come across this a-way (indicating), and by that time they had done hit."

He further testified that he could tell by the headlights of the truck that the truck was veering off on its wrong side of the road, whereupon Manieri pulled to his right and his car went out of control and came back on the road where he was hit; that although the Manieri car was heading back across the road to its left it was still completely on its side of the road when it was hit and that it had not reached the center line; that the truck was on the north side of the center line when they hit and had started to cross the center line before Manieri ever pulled to his right.

Appellants in their brief have admitted that the testimony of Armstrong supports the jury findings on all of the liability issues. The testimony of Armstrong is in part corroborated by that of Manieri who testified that the truck was almost on the wrong side of the road, and also by the fact that the truck and trailer, despite their great weight, ended up on the north side of the highway some 200 feet beyond the point of impact. Appellants have not, in their amended motion for new trial nor in their brief, attacked the affirmative findings of the jury to the "proper control" issues.

We have carefully weighed all of the evidence both favorable to the jury's findings and militating against the same, and have concluded that the findings that Rhoden drove the truck onto the left one-half of the roadway, and also that he failed to keep a proper lookout, are supported by ample evidence and are not against the great weight and preponderance of the evidence. Such findings support the Court's judgment independently of the findings of the jury to the issues on the truck's speed. Gulf, C. & S. F. Ry. Co. v. Deen, Tex., 312 S.W.2d 933; In re King's Estate, 150 Tex. 662, 244 S.W.2d 660.

■ Appellants' Fourth Point asserts that the Court erred in not granting a new trial because certain non-responsive answers of John Armstrong were erroneously admitted in evidence to their prejudice.

Appellants' first complaint is based upon the following:

"Q. Let me see if I understand what you are saying here. The Lincoln car pulled off to the right a little bit, and its right wheels dropped off of the pavement, and then he jerked it back on, and when he did, he jerked it all the way across the road; is that what you are saying? A. No, sir, I didn't say that he jerked it all the way across the road.

"Q. All right.

\*     \*     \*     \*     \*     \*

"A. No, first I want to tell you the reason why that I would say he pulled off on the side of the road, pulled off on that side: Because the truck was coming across, those lights of the truck was coming towards him, and he was pulling off on that side,—. I stepped on my brakes, because his stop lights come on, and just as he pulled off the road,—the truck was already on his side; and when the truck hit the car, the truck went in the ditch on our side, the car's side, that's what happened to the truck. It went straight over in the ditch on our side, on the north."

Appellants' objection to the above answer was limited to its non-responsiveness. Counsel's question included several separate but related inquiries. The witness testified he did not say that Manieri jerked his car all the way across the highway. He

then undertook to explain just what happened, in answer to the several inquiries included in the question. Part of his answer was non-responsive but part thereof was responsive. The objection was to the answer in its entirety and failed to point out the non-responsive part and was therefore insufficient. Brown & Root v. Haddad, 142 Tex. 624, 180 S.W.2d 339. Further, the testimony given was merely cumulative of the witness' preceding testimony admitted without objection. Traders & General Ins. Co. v. Smith, Tex.Civ.App., 311 S.W. 2d 91, ref., n.r.e.

■ With one exception, the witness' answers to the other questions were mainly responsive or merely cumulative of other testimony of the witness that had been admitted without objection. When, however, the witness was asked, "Did they hit head-on?" he answered, "They didn't hit head-on, because if they had hit head-on it would have knocked him back into me." The part of the answer beginning with the word "because" was a conclusion and not responsive. We have concluded, however, that in light of the testimony, and the fact that no one testified the collision was head-on, and further because it would probably have been obvious to the jury that no one could know what would have happened to the motor vehicles had it been a head-on collision, such statement was not reasonably calculated to cause nor did it probably cause the rendition of an improper judgment. Rule 434, T.R.C.P.

■ In their Fifth Point, appellants contend that the jury's verdict is excessive and that it was prompted by passion and sympathy for appellee. We do not agree. The jury awarded appellee $4,500 for mental anguish to date of trial but nothing for physical suffering, $10,000 for mental anguish beyond such date, $12,500 for lost earnings to date of trial, and $111,000 for his diminished capacity to work and earn money in the future. The judgment was for the aggregate of such amounts plus $2,-

396.16 hospital, medical and doctor expenses stipulated by the parties.

Appellee at the time of his injury was a young man 28 years of age and in good health and physical condition, with the exception of a stomach ulcer which did not interfere with his work in any way. At the time of his injury his life expectancy was nearly 40 years. He was earning at the time $2.50 an hour plus his living expenses and a car allowance of 8 cents per mile while he was away from Houston, and $1.60 per hour when he worked in his employer's shop. He worked 40 to 44 hours per week. He was out of town approximately 10 days of each month. His boss testified that appellee was a very reliable man, did his work well, was liked by everyone, and that he definitely would have expected him to make advancements. Appellee had not gone to school beyond the 9th grade and had worked since he was 14 years of age. He had worked in shipyards and as a draftsman, and had entered the Merchant Marine at 18, remaining about 5 years. At the time of his injury he was working for Griffin Wellpoint Service as a mechanic and welder in the shops, and he also threaded pipe and installed and supervised de-watering systems out in the field. He had earned no money since the accident and is permanently · disabled. Appellants in their brief candidly state that "His future prospects for gainful employment are bleak to the extent that they are virtually non-existent."

Dr. George Ehni, a neuro-surgeon, testified that when he first saw appellee he was irrational and resistive. He had a laceration about 4 inches in length on the right side of his scalp. He had multiple lacerations about his right shoulder blade, one of which appeared to be infected, and he had a broken hand. Some 20 days after the accident he regained sufficient consciousness to indicate his hand was hurting. Dr. Ehni's diagnosis was a severe injury to the head and a bruising type of injury to the brain and a flooding of the spinal fluid with irritative effects. He testified that

there is no regeneration or replacement of damaged or destroyed cells in the brain resulting from a brain injury. He bored two holes through Manieri's skull to inspect the brain, and observed in looking through the holes that on the right side of the surface of the brain was reddish from blood. He concluded that appellee had a bruising injury to part of his brain and some pressure and bulging inside the brain. Since appellee had serious gait and motor impairment, Dr. Ehni was of the opinion that the brain damage was to the cerebellum or in the cerebellar connections with the upper brain stem. He performed an electroencephalogram, which showed the brain cells were functioning abnormally. Following these tests, Manieri was placed on anti-convulsive epileptic drugs. Dr. Ehni last saw Manieri on February 3, 1956, at which time appellee felt unsteady, had difficulty in managing words and making sentences and had incoordinate difficulties in his right arm and leg that he had had all along without any change in that situation over previous examinations. He testified that the condition of disability was permanent.

Dr. James Greenwood, a well-known neuro-surgeon, first saw appellee on April 30, 1956. He observed rather severe incoordination of speech, which made appellee difficult to understand. He concluded that his trouble was probably in the cerebellum, which has a tremendous amount to do with coordination of muscle movements. Dr. Greenwood testified that from a mechanical standpoint, the speech impairment and incoordinate use of the right side of appellee were due to an impairment of the brain that controls the "check" muscles. He described Manieri's condition as "pretty severe." He pointed out that even in smiling, one side of appellee's face moved slower than the other, and that when he reached for a door knob he would miss it, and that such condition also applied with respect to movement in his right leg; that his main injury was his terrific inability to coordinate on the right side of his body. He further

testified that appellee deeply resented the fact that he had been handicapped and felt that he would not get well. In March of 1957 Dr. Greenwood noticed that appellee could not jump at all on his right foot and if he attempted it he would fall; that the jumping test is a good test for coordination. He testified that appellee's condition of disability is permanent, that he will never have a good right side, and that the same situation is true with respect to his speech. Dr. Greenwood performed a pneumoencephalogram, which consisted of injecting air or oxygen through the spinal canal up into the brain and skull, and concluded that the test showed some destruction to the cerebrum. He also testified that the test is one that doesn't give much information in regard to the cerebellum, but that he knew appellee had that injury to the coordinative tracts either in the cerebellum or somewhere in the neighborhood; that he may have had some brain-stem damage inasmuch as he had double vision for a while. He testified that he could not on a physical examination pass appellee for work involving movement, operating vehicles and physical labor.

In view of the size of the verdict in this case, we have given the foregoing summary of the evidence relating to the extent and nature of the injuries sustained by appellee, as well as his loss of earning capacity. We do not think that the verdict is excessive in view of the age and life expectancy of appellee, the amount of money he was making and the probability of promotions, the seriousness of his injuries, his past and future mental anguish, his lost or diminished capacity to labor and earn money, the severe damage to his brain, his impairment of speech, and his permanent inability to coordinate on the right side of his body.

In Thompson v. Robbins, Tex.Civ.App., 297 S.W.2d 247, affirmed Tex., 304 S.W.2d 111, a judgment for $75,000 was upheld where a 56 year old brakeman with a life expectancy of only 17.10 years and capable of earning $6,000 per year, was totally and permanently disabled.

In Thompson v. Barnes, Tex.Civ.App., 236 S.W.2d 656, this Court affirmed a judgment for $85,000 in the case of a 53 year old conductor, who was disabled for work. The record in that case shows that Barnes' average monthly check was between $350 and $400, instead of $563 as incorrectly recited in Missouri Pacific Railroad Company v. Rhoden, Tex.Civ.App., 310 S.W.2d 607, no writ history.

See also Houston Belt & Terminal Railway Co. v. Burmester, Tex.Civ.App., 309 S.W.2d 271, ref., n.r.e., where this Court required a remittitur of $40,000, which was filed, and affirmed the reformed judgment for $120,000.

We find no merit in appellants' Sixth Point of Error asserting that cumulative errors in the present case prejudiced appellants. We find no such errors.

The judgment of the Trial Court is affirmed.