**KIMBRIEL PRODUCE CO., Inc., et al. v. WEBSTER et al.**

No. 11443.

Court of Civil Appeals of Texas. San Antonio.

Nov. 22, 1944.

Rehearing Denied Jan. 3, 1945.

Sid L. Hardin, of Edinburg, Johnson & Rogers, of San Antonio, R. E. Schneider, of George West, Nat L. Hardy, of San Antonio, A. M. Felts, of Austin, Eskridge & Groce, of San Antonio, Harry Schulz, of George West, T. P. Hull, of San Antonio, and Walter Groce, of San Antonio, for appellants.

Chas. J. Lieck, Schlesinger & Goodstein, and J. Douglas McGuire, all of San Antonio, for appellees.

NORVELL, Justice.

This action grew out of a collision between a truck owned by Kimbriel Produce Company, Inc., and a common carrier passenger bus operated by Joe Amberson, doing business as Union Bus Lines. The collision took place on U. S. Highway 281, near the town of Three Rivers, Texas. We refer to the report of Kimbriel Produce Company v. Mayo, Tex.Civ.App., 180 S.W.2d 504, writ refused for want of merit, for a statement of the facts and circumstances of this collision, rather than repeat the same here. See also: Union Bus Lines v. Moulder, Tex. Civ.App., 180 S.W.2d 509; Union Bus Lines v. Byrd, Tex.Civ.App., 178 S.W.2d 544; Union Bus Lines v. Byrd, Tex.Sup., 177 S.W.2d 774.

Vera Webster, a passenger on the bus, was severely injured in the collision, and brought suit against both Kimbriel and Amberson, through her father, Paul Webster, as next friend; she being a minor, eighteen years of age. The trial court rendered judgment (upon special issues) for Paul Webster in the sum of $4580.50, and for Vera Webster in the sum of $46,000, and against Kimbriel and Amberson jointly and severally. The judgment provided for contribution between Kimbriel and Amberson in accordance with the provisions of Article 2212, Vernon's Ann.Civ.Stats. Both Kimbriel and Amberson have appealed.

The jury found that Edward Baird, the driver of the Kimbriel truck, was negligent in failing to keep a proper lookout and in driving his truck upon the paved portion of U. S. Highway 281. These findings (together with connecting issues relating to proximate cause) form the basis of liability against Kimbriel as determined by the judgment.

■ Kimbriel here asserts that there was no evidence supporting the finding that Baird did not maintain a proper lookout. Baird testified that he did maintain a lookout and saw the lights of the approaching bus prior to the time he drove the truck upon Highway 281. His testimony was, to some extent, corroborated by that of his wife, who was riding with him at the time of the collision. There were, however, circumstances disclosed by the evidence from which the jury could infer that Baird did not maintain a proper lookout. Baird's action in taking the south prong of the Y then turning to the North on the highway was one which the jury could properly attribute to his failure to maintain a proper lookout. The evidence was such that the jury could have properly believed that Baird did not discover the bus approaching from the north, despite his testimony that he did. The testimony likewise and for like reason supports the jury finding that Baird was negligent in driving onto the paved portion of U. S. Highway 281.

We overrule Kimbriel's points Nos. 12 and 3 to 7, inclusive. Kimbriel Produce Company v. Mayo, Tex.Civ.App., 180 S.W. 2d 504. We likewise overrule Kimbriel's points Nos. 8 to 11, inclusive, which raise the contention that the findings of the jury upon the issues discussed (the failure to keep a proper lookout and the driving of the truck upon the paved portion of the highway) are against the overwhelming preponderance of the evidence.

■ The trial court submitted certain issues to the jury upon the theory that liability as between Kimbriel and Amberson, as tort feasors, could be determined upon the doctrine of discovered peril. Kimbriel here contends by its thirteenth point that certain issues in the group submitted in accordance with the theory mentioned were conflicting and that a new trial should be ordered. In the Mayo case, 180 S.W.2d 504, we held that the doctrine of discovered peril had no application to the question of liability as between defendant

tort feasors, consequently Kimbriel's point does not present a reversible error and is accordingly overruled.

No reversible error is disclosed by Kimbriel's fourteenth point, which complains of the definition of "new and intervening cause," as used by the trial court in defining "proximate cause" in the charge to the jury.

We are also of the opinion that there is no showing that Amberson was in anyway prejudiced by the trial court's rulings complained of in Amberson's Points Nos. 5 to 8, inclusive, and said points are consequently overruled.

■ Kimbriel (by its first and second points) and Amberson (by his ninth and tenth points) insist that reversible error was committed by the trial court in overruling a motion to discharge the jury and declare a mistrial.

The case went to the jury about 4:30 p. m. on January 25, 1944. On the 26th, about 3 p. m., the jury reported in open court that it had been unable to reach a verdict. The foreman, however, reported that with the exception of the issues relating to the amount of damages sustained, the jurors had answered all issues except two, and expressed the belief that these could be answered if some further explanation were given as to the meaning of the term "proximate cause," as used in the charge. The judge told the jury that he was unable to give any further instructions and the jury returned to the jury room for further deliberations.

The jury came back into open court about 6:30 p. m. and the following conversation took place between the judge and the foreman of the jury, to-wit:

"The Court: Gentlemen, do you think there is any possibility of your answering those two questions?

"The Foreman: Would it be possible to determine this question of proximate cause? For instance, a definition out of Webster's Dictionary? It might throw some light on the meaning of the term?

"The Court: I'm afraid we couldn't use Webster's Dictionary. The definition has been handed down by the appellate courts and it is the definition that we are instructed to give. We can't give you another definition.

"The Foreman: You could not throw any additional light on the possible meaning of it?

"The Court: No, I can give you nothing additional to what is in this charge. If I give you anything additional I would have to reopen the case and let the attorneys argue it. Gentlemen, suppose you all go back and try for the next hour to answer the questions."

Apparently, at the time of this last report the jury had found that Kimbriel's truck driver had failed to keep a proper lookout and that he had negligently driven his truck onto the paved portion of U. S. Highway 281. The two unanswered issues inquired as to whether or not these actions or omissions were proximate causes of the collision.

Soon after the jury returned for a second time, both Kimbriel and Amberson made motions for mistrial, which were overruled by the court. Later the jury returned a complete verdict finding against Kimbriel on both of the proximate cause issues mentioned.

Appellants, in support of their contention that the trial court committed reversible error, cite Pecos & N. T. Ry. Co. v. Finklea, Tex.Civ.App., 155 S.W. 612, 613; North Dallas Circuit Ry. Co. v. McCue, Tex.Civ.App., 35 S.W. 1080; and Hunter v. Hunter, Tex.Civ.App., 187 S.W. 1049, which hold that a litigant is entitled to a verdict based upon the honest conviction of twelve men uninfluenced by coercive action on the part of the trial judge. A reading of the authorities cited discloses a different factual situation from that presented by the record here. We do not think that the remark, "suppose you go back and try for the next hour to answer the questions," can be considered as having the effect of obtaining a verdict by coercion. We are of the opinion that the trial judge did not abuse the discretion vested in him by law. Kimbriel's first and second points and Amberson's ninth and tenth points are overruled.

Amberson's points Nos. 1 to 4, inclusive, and Kimbriel's points Nos. 15 and 16, raise the contentions that there is no evidence supporting a recovery of $46,000 in favor of Vera Webster and that such award of damages is grossly excessive.

As above indicated, Paul Webster, the father of Vera Webster, was awarded a recovery of $4,580.50. This amount is based upon reasonable doctor bills, hospital expenses, etc., paid or incurred as a result of the medical care provided for Vera Webster in connection with the treatment of her injuries. No complaint is here made as to the amount of this award.

The amount of $46,000 was given in answer to the following issue submitted by the court:

"Question No. 42: What amount of money, if any, if paid in cash now, do you find from a preponderance of the evidence, would fairly and reasonably compensate the plaintiff, Vera Webster, for the injuries, if any, incurred as a proximate result of the collision in question?"

In connection with this issue, the jury was instructed that they could only take into consideration the following elements of damage resulting from injuries sustained; namely, (1) physical and mental pain and suffering endured from the date of the injury up to the time of the trial, (2) probable physical and mental suffering which would endure in the future, and (3) diminished earning capacity from and after the time Vera Webster reached the age of twenty-one years.

Miss Webster was occupying the right front seat of the bus when the collision occurred and was asleep at the time. She suffered a severe concussion of the brain and did not regain consciousness until some three days after the collision. She sustained a torn wound or cut on the head extending from the corner of the right eye up over the forehead into the scalp, a bruise on the back of the head and a severe cut across the bridge of the nose. Her most serious injuries were those relating to her left leg. The femur was broken and the bone protruded through the flesh. The left ankle was crushed and the soft tissues covering the ankle bones completely torn away. Miss Webster was first placed in a hospital at Three Rivers and thereafter taken to the Santa Rosa Hospital in San Antonio, where she remained from July 18, 1942, to July 1, 1943. She was placed under the charge of a bone specialist, Dr. Edward Cayo, who testified at the trial. The fracture of the femur was set by means of an open reduction, that is, an incision about nine inches long was made in the thigh to the depth of the bone and the ends thereof tied together and in place with braided silk inserted through holes drilled in the ends of the bones. In addition, some nineteen pieces of skin and flesh, "about the size of the end of a little finger," were taken off the thigh and grafted onto the ankle to replace the missing tissue in that region. The leg was placed in a splint and suspend-

ed by means of ropes and springs so that a constant tension was maintained on the leg. On May 11, 1943, another operation was performed upon the left leg in an effort to lengthen the tendons and stretch the muscles in order to permit the bending of the knee. In all, Miss Webster spent over eight months in bed and during the greater part of this time she was flat on her back and wholly unable to move the left leg.

As to permanent effects or conditions from these injuries, Dr. Cayo's testimony may be fairly summarized as follows: The effects of the brain concussion have largely disappeared with the exception of occasional headaches. The head and nose wounds have healed leaving scars which are somewhat disfiguring and tender when touched with a comb or some like object. The femur has grown back together in place, but the muscles of the upper leg have been severely weakened by the injuries to the tissue resulting from the compound fracture and the incising of the leg in order to set the bone. The knee action is restricted to an angle of 45°. The ankle is now a solid piece of bone, "like a mass of concrete," there is no joint and movement in the foot is restricted to the toes. The foot disability is about seventy-five per cent. The skin and flesh which was grafted onto the ankle is not supplied with a normal complement of arteries and veins, and consequently is subject to injuries and infections which take long periods of time in which to heal. The contour of the left leg differs from that of the right leg. The left ankle is much larger than the right, about ten and a half inches in circumference as compared to six inches for the normal ankle. The left limb from the knee to the ankle is undeveloped, while the thigh presents a swollen appearance because of the formation of scar tissue. The left hip, as compared with the right, presents a shrunken appearance, due to non use of the left leg. Miss Webster must now make use of crutches to move from one place to another. In time she may be able to get along with one crutch or perhaps a cane.

At the time of the collision Miss Webster was almost nineteen years of age and employed as a stenographer by the Public Service Board of San Antonio, at a salary of $90 per month. She had received a high school education and attended a business or secretarial training school. While her hands and fingers were not affected or injured, the condition of the left leg ren-

ders it impossible for Miss Webster to sit in a chair or at a desk in a normal position, but makes necessary the occupying of a sideways position with the weight of the body resting primarily upon the right hip. From the evidence, we think the jury could have properly concluded that in the future Miss Webster would be unable to steadily work at a position which required her services from seven to eight hours per day. In all probability she would be restricted to working less than the standard working day. Miss Webster's life expectancy at the time of her injury was approximately forty-three years.

■■ The record of the evidence here undoubtedly supports the award of a large sum of money as damages. The determination of the amount rests primarily with the jury, and there is no set formula applicable to cases of this character whereby the exact amount can be measured or ascertained. The amount of the award is not, however, free from control or revision by either the trial court or this Court. "The doctrine is now generally accepted that the verdict of the jury is subject to the supervision of the court whether such verdict is too large or too small." 15 Am. Jur. 620. "Precedents are helpful and of some value in determining whether damages awarded for similar personal injuries are or are not excessive or inadequate," 25 C.J.S., Damages, § 198, p. 914, although it be conceded that no two injuries are alike in all particulars and do not have the same consequences or results insofar as damages are concerned. It is recognized that "there should be a reasonable uniformity as to the amount of verdicts and judgments in the various cases." McNatt v. Wabash Ry. Co., 341 Mo. 516, 108 S.W.2d 33, 43.

It is unnecessary for us to here cite the multitude of cases which involve the amount of damages awarded for injuries more or less similar to those sustained by the appellee here. They will be found collated in legal reference works and encyclopedias as follows: 13 Tex.Jur. 302-312, 25 C.J.S., Damages, § 198, pp. 954–968, 15 Am.Jur. 640-647. See also Houston & T. C. R. Co. v. Shapard, 54 Tex.Civ.App. 596, 118 S.W. 596, writ refused; Galveston, H. & S. A. Ry. Co. v. Andrews, Tex.Civ.App., 291 S.W. 590; Texas & N. O. R. Co. v. Haney, Tex.Civ.App., 144 S.W.2d 677.

■■ After a careful consideration of the evidence and the authorities alluded to, we have come to the conclusion that the

verdict of the jury is excessive to the extent of $10,000.00. One element which must be considered along with the life expectancy of an injured person is the fact that cash money can and does produce returns by way of interest. As stated in the trial court's charge, damages are determined by the amount of money "if paid in cash now" would reasonably compensate the injured person. When the interest bearing properties of money are considered (even at the present prevailing low rates), it will be seen that the verdict is clearly excessive when compared to awards which have been upheld in cases relating to injuries similar to those sustained by the appellee here. In fact, the sum of $36,000 is a larger amount than sums which have been awarded in the past for somewhat similar injuries. We regard the record as presenting an extreme case of past and probable future physical pain and mental suffering. We have also taken into consideration the decreased purchasing power of the dollar at the present time, as compared with such purchasing power in the past. 15 Am.Jur. 621.

Upon the record, it is our duty to suggest a remittitur in accordance with Rule 440, Texas R.C.P.

Appellants' points disclosing no reversible error saving those complaining of the excessiveness of the verdict in favor of appellee Vera Webster, the judgment in favor of Paul Webster for the sum of $4,850.50 will be affirmed. If appellee Vera Webster will file in this Court, within twenty days from date hereof, a remittitur of $10,000, the judgment as to her will be reformed and affirmed for the sum of $36,000; otherwise said judgment will be reversed and the cause remanded.

Affirmed on condition of remittitur.

### On Motions for Rehearing.

The motions for rehearing filed herein by appellants, Kimbriel Produce Company, Inc., and Joe Amberson, are overruled.

Appellee, Vera Webster, has filed herein a motion for rehearing and also a remittitur of $10,000, as suggested by this Court. The remittitur is subject to the Court's action on the motion for rehearing. Said motion for rehearing is overruled. The judgment of the trial court in favor of Vera Webster will be reformed in accordance with the remittitur, so as to allow appellee, Vera Webster, a recovery of $36,000 against appellants, Kimbriel Produce Company, Inc., and Joe Amberson, jointly and severally. The judgment as thus reformed will be affirmed. Costs of appeal will be taxed against appellee Vera Webster.