BEST STEEL BUILDINGS,
INC., Appellant,

v.

Rosemary Jeffers HARDIN et
al., Appellees.

No. 935.

Court of Civil Appeals of Texas,
Tyler.

March 24, 1977.

Rehearings Denied June 9 and
June 23, 1977.

Jesse R. Pierce, Foreman, Dyess, Prewett, Rosenberg & Henderson, Houston, for appellant.

Robert H. Roch, Russell L. Cook, Jr., Fisher, Roch & Gallagher, Ronald L. Blackstock, Quinnan H. Hodges, Houston, for appellees.

MOORE, Justice.

This is a wrongful death action and property damage action arising out of an automobile-truck collision. Plaintiffs, Rosemary Jeffers Hardin and Lisa Jean Hardin by next friend, Rosemary Jeffers Hardin, Verna Jane Martin by next friend, Janie Martin Lee, M. C. Bandy, and J. H. Rose Truckline, Inc., brought suit against defendant, Best Steel Buildings, Inc. and Nancy Smith Graham and husband, for damages arising from the death of Willard Hardin and Kenneth Martin and for property damage incurred in the collision. The Transport Insurance Company intervened for subrogation of workmen's compensation benefits paid to the survivors of Willard Hardin and Kenneth Martin. Prior to trial, the cause of action against Nancy Smith Graham and husband was nonsuited by plaintiffs.

Trial was to a jury. In response to the special issues, the jury found that Louis Davis, an employee of Best Steel Buildings, Inc., was guilty of negligence in the operation of his automobile, such negligence having proximately caused the collision. The jury further found that this employee, Louis Davis, was acting within the course and scope of his employment for Best Steel Buildings, Inc. on the occasion in question. The jury awarded damages to the plaintiffs in the following amounts: Lisa Jean Hardin—$50,000.00; Rosemary Jeffers Hardin—$225,000.00; Verna Jane Martin—$50,000.00; Marie Bandy Weisser—$22,400.00; J. H. Rose Truckline, Inc.—$4,554.56. After defendant Best Steel Buildings' motion for judgment n. o. v. was denied, the trial court entered judgment on the verdict. Defendant, Best Steel Buildings, Inc., timely filed its motion for new trial and after the same was overruled, perfected this appeal.

For convenience, Best Steel Buildings, Inc. will be referred to as "appellant." The appellees will be referred to individually by name and collectively as "appellees."

We affirm in part and conditionally affirm in part.

The collision made the basis of this suit occurred at approximately 9:00 a. m. on Monday, February 27, 1967, on a bridge on Highway 290 near Manor, Texas. At the point where the accident occurred, the highway runs generally east and west across the bridge. The bridge was 420 feet long and was composed of two lanes each of which was twelve feet in width.

Three vehicles were involved in the occurrence, two automobiles and a tractor-trailer truck. The truck was owned by J. H. Rose Truckline, Inc., and was proceeding east on Highway 290. It was being driven by Kenneth Martin and Willard Hardin was a passenger in the truck. The two automobiles were headed west. The lead automobile was a Pontiac sedan driven by Nancy Smith Graham. Following the Pontiac was a Simca driven by Louis Davis. His son, James Davis, and his son's wife were passengers in the Simca. The collision was between the truck driven by Willard Hardin and the Simca driven by Louis Davis. The point of impact was five feet south of the center line in the eastbound lane in the truck's lane of travel. Louis Davis and Mrs. James Davis were apparently killed upon impact and Kenneth Martin and Willard Hardin were burned to death in the tractor which left the roadway and caught fire after impact. James Davis was the sole survivor from the two vehicles. The evidence shows that the Simca struck the rear of the Pontiac which had slowed to avoid hitting a dog. After striking the Pontiac the Simca, driven by Louis Davis, skidded across the center line rear-end first, causing the impact between the rear of the Simca and the left front of the truck.

At the time of the collision, Louis Davis and James Davis were returning to Austin, their place of employment, with appellant, Best Steel Products, Inc., from Houston where they had spent the night. Appellant is in the business of constructing metal buildings and at the time of the collision was building such a structure on the University of Texas campus in Austin. Louis and James Davis lived near Houston, Texas, but while engaged in the construction of the building they stayed in a motel in Austin along with James Davis' wife. Kenneth Martin and Willard Hardin were engaged in transporting freight for their employer, J. H. Rose Truckline, Inc., at the time of the collision. Since appellant does not challenge the jury's verdict finding that the negligence of Louis Davis, deceased, proximately caused the collision, it will not be necessary to delineate the facts showing his responsibility for the collision.

In response to the first and second special issues, the jury found: (1) that Louis Davis was within the course and scope of his employment with Best Steel Buildings, Inc. at the time of the collision; and (2) that at the time of the collision Louis Davis was operating his vehicle in furtherance of a mission for the benefit of Best Steel Buildings, Inc. and subject to the right of control by Best Steel Buildings, Inc. as to the details of the mission.

Under the first point of error appellant seeks a reversal on the ground that the court erred in admitting certain testimony. Under points two through five appellant seeks reversal on the grounds that the evidence is legally and factually insufficient to support the jury's findings that Louis Davis was in the course and scope of his employment with appellant, Best Steel Buildings, Inc. at the time of the collision. We will discuss the "no evidence" and "insufficient evidence" points first.

Under the second and fourth points, appellant contends that the trial court erred in overruling its motion for judgment N.O.V. because there is no evidence to support Special Issues Nos. 1 and 2, finding that Louis Davis was acting in the course and scope of his employment with Best Steel Buildings, Inc. In passing on these points of error, we must consider only that evidence which is favorable to the appellees and must draw from the facts proved only

those reasonable inferences which tend to support the jury's findings and the judgment based thereon. *Miller v. Riata Cadillac Co.*, 517 S.W.2d 773 (Tex.1974); *Transport Ins. Co. v. Mabra*, 487 S.W.2d 704 (Tex. 1972); *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965); *Jecker v. Western Alliance Ins. Co.*, 369 S.W.2d 776 (Tex.1963); *Dictaphone Corp. v. Torrealba*, 520 S.W.2d 869 (Tex.Civ. App.—Houston [14th Dist.] 1975, writ ref'd n.r.e.).

The record shows that several weeks prior to February 27, 1967, the date of the accident, the appellant had been erecting a steel building in Austin, Texas. Louis Davis and James Davis, as well as other members of the crew of the appellant, lived in and around Houston, Texas. After working in Austin for several weeks, they returned to Houston for a one week period because certain materials had not reached the job site. During that week in Houston they were not paid any wages.

The crew had returned to the job site in Austin about a week prior to February 27, 1967. The crew consisted of Bob Drouet, Kenneth Wright, John Pirsch, Jack Porter, James Davis and Louis Davis. Bob Drouet, age nineteen, was the foreman of the job. August Drouet, the father of Bob Drouet, was an officer and stockholder of appellant company and was supervisor of the crew. August Drouet was not present at the job site, but was in Houston.

In addition to regular pay, appellant's building crew was paid five dollars a day as expense money which was added to the weekly pay checks. When the crew returned the week before the accident, Louis Davis had drawn some expense money in advance but James Davis testified he had no expense money with which to pay his motel bill in Austin. It is undisputed that the crew worked until the early afternoon on Sunday, the day before the accident, at which time the job was shut down. It is likewise undisputed that sometime later in the afternoon James Davis, his wife, and Louis Davis left for Houston in Louis's Simca automobile. The reason for the trip to Houston and its purpose, as well as other surrounding circumstances, can best be described by a summary of the testimony given by each of six witnesses.

James Davis testified that on Sunday afternoon, February 26, 1967, the building crew had a shortage of certain building materials, including self-tapping screws which were essential to the construction of the building. He testified that he walked up during a conversation between Louis Davis and Bob Drouet, the foreman, and heard Drouet say that he would appreciate it if Louis and he would go to Houston and pick up some items. An inventory was taken to determine what materials they were to get. It was determined that a box of blue and white self-tapping screws, a roll of chicken wire and some expense money were needed. In addition, Louis was to check about procuring some window frames. The list of items was written on a piece of cardboard box which Louis Davis carried with him to Houston. Before leaving Austin, Bob Drouet suggested that all three of them go to a filling station so that he could call his father, August Drouet, in Houston. After being unable to reach his father, Bob Drouet told them to go to Houston and he would keep trying to call his father and advise him they were coming for the supplies. James testified that but for the instructions given by Bob Drouet they would have stayed in Austin. Before leaving for Houston, they went back to the motel and picked up his wife and then embarked upon Highway 290 which was the most direct route to Houston. When they went through Waller, Texas, which is about 50 miles from Houston, Louis Davis stopped by his home and changed clothes. They then proceeded to Best Steel's place of business in Houston, arriving there at about 6:30 p. m. After finding no one there, Louis Davis telephoned August Drouet who advised him that it would not be necessary for them to take the supplies back with them because he had already made arrangements for the supplies to be taken to Austin by truck early Monday morning. August Drouet also told them that they could drive back to Austin that night or wait until the next morning to make the trip. Although

originally they had planned to return to Austin that night, after talking to August Drouet they spent the night in Houston. They left for Austin early Monday morning and were traveling on Highway 290 when the accident occurred. James Davis testified that before going to Houston, Bob Drouet was asked if he wanted them to use the company truck and bring back the window frames and he stated "No, go ahead and go in and go . . . for the expense money and self-tapping screws." He further testified that Louis Davis would have normally been paid mileage for using his own automobile but was unable to request his mileage expense because of his death.

Mrs. Roberts, the manager of the San Jose Motel where the Davises stayed in Austin, testified that Louis Davis had told her on Sunday afternoon that he was leaving for Houston to pick up some supplies and expense money.

Bernice Robertson, the widow of Louis Davis, testified that she and Mr. Davis lived in Waller, Texas, and their daughter lived in Fairbanks, Texas, which was in the same general area. She testified that her husband had telephoned her on Saturday, February 25, 1967, and advised her that he would not be home that weekend because he had to work. The following day, February 26, 1967, at about 8:30 p. m. Louis Davis arrived at his daughter's home where she was visiting and she was surprised to see him. He told her he had been sent to Houston to get expense money, some supplies and screws. They spent the night at their daughter's home, and he left for Austin at about 5:00 a. m. the following morning.

Kenneth Wright, a member of the work crew, testified that the crew stopped work about 2:00 or 2:30 p. m. on February 26, 1967. He testified that the crew did not have sufficient supplies to continue working. He stated that the crew was in need of a roll of chicken wire. He overheard a conversation between Louis Davis and Bob Drouet concerning the shortage of materials. In particular, he overheard Drouet and Davis determine that they needed some

more self-tapping screws. He testified that he saw Bob Drouet tear a piece of cardboard from a box and write something on it. He also overheard Bob Drouet say to Louis and James Davis, "Why don't you all go to Houston, go to the office and pick up screws, expense money." He was not certain whether or not they were told to get a roll of chicken wire. Wright further testified that shortly after the conversations with Louis and James Davis, Bob Drouet left the job site for a while and then came back and went home. He testified he overheard Bob Drouet tell Louis Davis that he would call his father, August Drouet, and tell him that Louis Davis was coming to pick up expense money and supplies.

Appellant called two witnesses, Jack Porter and John Pirsch, who testified with regard to the Houston trip. Jack Porter testified that he had a conversation with Louis Davis during the morning before the trip to Houston on Sunday afternoon. He testified that Louis told him that he and James and James's wife wanted to go back to Houston to take care of some business concerning an automobile accident in which his son, James, had recently been involved. Porter stated, however, that he did not know whether Louis Davis proposed to handle the business in Austin or in Houston. James Davis had previously testified that he had been involved in an accident in Austin and that his automobile was in a repair shop there at the time he went with his father to Houston. Porter testified that he did not overhear any comment made by Bob Drouet to Louis Davis about the matter of the proposed trip to Houston. According to his testimony the job was shut down because the wind was so strong that it would have been dangerous for the crew to continue working on Sunday afternoon and the crew members had discussed the problem prior to the time the work was stopped. Although he recalled some shortage of supplies, Porter also testified that the shortage was not such as would have kept the crew from working. Porter testified that he did not work on Monday morning, but rather "rode around" with Kenneth Wright. The reason why he didn't work

was, according to his testimony, because he didn't want to and not for the want of materials.

John Pirsch, the other witness called by appellant, testified that he overheard a portion of the conversation between Bob Drouet and Louis Davis in which Louis Davis said something about going back to Houston to see his family and coming back on Monday. He further testified that he saw Bob Drouet make a list of material on a piece of cardboard. Although he admitted that he had previously testified that there had been a shortage of stitch screws, he testified that the crew had stopped working because the strong wind made it difficult to handle large pieces of sheet metal.

Neither Bob Drouet nor his father, August Drouet, was called as witnesses by either party.

■ Appellant argues that the adverse testimony is so weak and circumstantial that it amounts to nothing more than a scintilla of proof and, therefore, constitutes no evidence in support of the jury's findings that Louis Davis was acting in the course and scope of his employment and was subject to the right of control by his employer at the time of the collision. We cannot agree with this proposition. When viewed in a light most favorable to the verdict, we think the testimony of James Davis and Kenneth Wright, together with other facts and circumstances established by the testimony of other witnesses, constitutes ample evidence of probative force to support the jury's verdict. James Davis testified that he was present and heard Bob Drouet direct Louis Davis to go to Houston and pick up the supplies. It is undisputed that Bob Drouet attempted to call his father in Houston to notify him Louis Davis was coming for supplies, and it is undisputed that Louis Davis went to Houston and made an effort to pick up the supplies and was told by August Drouet that the supplies would be sent by truck the following day. Such evidence is, in our opinion, of sufficient probative force to support the finding that the trip to Houston was in the course and scope

of Louis Davis's employment and while performing the mission, he was subject to the right of control by his employer, Best Steel Buildings, Inc.

■ We cannot agree with appellant's contention that because there was some evidence Louis Davis stated that he was going to Houston to see his family, or to attend to some personal business, he was on a mission of his own and therefore was not in the course and scope of his employment. There is no evidence that he transacted any business of his own while on the trip. Even had it been established that he attended to some personal business or visited his family while on the trip, if, as the jury found, he was directed to make the trip in furtherance of the affairs of his employer, he would nevertheless be in the course and scope of his employment.

■ Conduct may be within the scope of employment, although done in part to serve the purposes of the servant or a third person. The fact that the preponderate motive of the servant is to benefit himself or a third person does not prevent the act from being within the scope of employment. If the purpose of serving the master's business actuates the servant to any appreciable extent, the master is subject to liability if the act otherwise is within the service of his employer. *Howard v. American Paper Stock Co.*, 523 S.W.2d 744 (Tex.Civ.App.—Fort Worth 1975) reformed and aff'd 528 S.W.2d 576 (Tex.1975); *Dictaphone Corp. v. Torrealba,* supra; *Eubanks v. Hughes Engineering Co.*, 369 S.W.2d 49 (Tex.Civ.App.—Forth Worth 1963, writ ref'd n.r.e.); Restatement (Second) of Agency, sec. 236 (1958).

Next, appellant argues that even if Louis Davis was in the course and scope of his employment when going to Houston, he was not in the course and scope of his employment at the time of the collision while returning to Austin because the evidence conclusively establishes that his mission was completed the night before the accident when his employer advised him that the supplies would be sent to Austin by

truck. We do not agree. The evidence shows that at the time of the collision Louis Davis was traveling back to Austin on Highway 290 which was the most direct route between Austin and Houston. There is nothing in the record to suggest that at the time of the collision he had undertaken a mission of his own.

The rule is that if an employee is sent on a special mission, he is considered as still on such mission while returning from the place to which he was required to go by his employer, unless he deviates from the purpose of his mission and engages in an enterprise of his own. *Shelton v. Standard Ins. Co.*, 389 S.W.2d 290 (Tex.1965); *Hartford Accident & Indemnity Co. v. Bond*, 199 S.W.2d 293 (Tex.Civ.App.—Eastland 1946, writ ref'd n.r.e.). Even though the primary purpose of the mission was aborted because appellant elected to send the supplies by truck, Louis Davis was still within his employer's control and in the furtherance of his employer's business while returning to the point where the mission originated in Austin. It is elementary that if an employee is instructed to go to a certain place and return, as here, he necessarily would be required to travel in both directions. We find no merit in appellant's second and fourth points and they are overruled.

Under its third and fifth points appellant urges that the trial court erred in overruling its motion for new trial because the evidence was factually insufficient to support the jury's finding that Louis Davis was in the course and scope of his employment on the occasion in question and was likewise factually insufficient to support the jury's finding that he was furthering the affairs and was subject to the right of control by appellant.

After a review of the entire record and after having weighed and balanced all the evidence, both that in favor and against the verdict and judgment, we are of the opinion that we would not be justified in concluding that the evidence is factually insufficient. Points three and five are overruled.

By its first point of error appellant urges that the trial court committed reversible error by admitting into evidence, over its objection on the ground of hearsay, the prior testimony of the witness, Kenneth Wright, which was given in a workmen's compensation suit filed and tried by Mrs. Louis Davis and James Davis against Argonaut Insurance Company.[1] As put by appellant, the question is: Did appellees establish the necessary predicate for the admissibility of the prior trial testimony of Kenneth Wright? We are of the opinion that they did.

The record reveals Argonaut Insurance Company not only carried the workmen's compensation insurance for appellant but was also appellant's liability carrier. Thus, in the former action Argonaut was the real party in interest just as in the present suit. There is no question but that the testimony of Kenneth Wright at the former trial of the workmen's compensation case was given on the same issues i. e. whether Louis Davis was within the course and scope of his employment at the time of the collision and that a full opportunity for cross examination existed upon the question of whether he was acting in the course and scope of his employment. Since Argonaut carried both the compensation insurance and the liability insurance for appellant, we think there was a practical or representative identity of the party against whom the prior testimony was offered. Absolute identity of the parties is not necessary. *St. Louis, Southwestern Ry. v. Hengst*, 36 Tex. Civ.App. 217, 81 S.W. 832, 836 (1904); McCormick and Ray, Texas Law of Evidence, secs. 949, 950.

The only question is the unavailability of the witness. Former testimony is not admissible if a witness is available at the subsequent trial. The party offering

---

1. *Davis v. Argonaut Southwest Ins. Co.*, 464 S.W.2d 102 (Tex.1971). In that case the Supreme Court reversed the Austin Court of Civil Appeals and ruled that the evidence was sufficient to support a finding that Louis Davis was acting in the course and scope of his employment with Best Steel Buildings, Inc.

the former testimony must therefore prove unavailability, which means in Texas that the witness is dead, or that he had become insane, or is physically unable to testify, or is beyond the jurisdiction of the court, or that his whereabouts is unknown and that diligent search has been made to ascertain where he is, or that he has been kept away from the trial by the adverse party. *Hall v. White*, 525 S.W.2d 860 (Tex.1975); *Houston Fire & Cas. Ins. Co. v. Brittian*, 402 S.W.2d 509 (Tex.1966); *Lone Star Gas Co. v. State*, 137 Tex. 279, 153 S.W.2d 681, 697 (1941).

■ Upon a pretrial hearing in the present suit it was shown that Mr. Wright was in Astonia, Oregon. The evidence at the pretrial hearing shows that the present case had been called for trial once before. Kenneth Wright was available as a witness at that time but the case resulted in a mistrial due to the illness of the trial judge before Wright was called as a witness. Several days before the present trial commenced appellees discovered that Kenneth Wright was in Oregon. On being contacted in Oregon by telephone a few days prior to trial with regard to testifying, Kenneth Wright replied that he would do "whatever God's will" or would do whatever God intended him to do. Later in the week appellees again attempted to contact him by telephone but were told by his mother that he was ill and unable to come to the telephone. According to his mother he had become ill after coming to Oregon, was undergoing psychiatric treatment and would probably be admitted to the hospital on that date. Appellees then employed an agent in Oregon to contact him and furnish him with expense money and a round trip plane ticket to Houston. The agent was unable to contact him and reported back that he was in a psychiatric hospital. Under these circumstances we think the evidence was sufficient to raise a fact issue on the question of whether the witness was physically or mentally unable to testify. Consequently, we find no abuse of discretion in admitting Kenneth Wright's testimony which he had given in the previous workmen's compensation case. *A. F. Conner & Sons, Inc. v. Tri-County Water Supply Corp.*, 541 S.W.2d 856, 859 (Tex.Civ.App. —Eastland 1976, no writ); *Harris v. Reeves*, 421 S.W.2d 689 (Tex.Civ.App.— Waco 1967, no writ); *Missouri-Kansas-Texas R.R. v. Bush*, 310 S.W.2d 404 (Tex.Civ. App.—Austin 1958, writ ref'd n.r.e.); McCormick & Ray, Texas Law of Evidence, sec. 947 (1956).

■ Even if the court erred in admitting the former testimony we do not believe the error, if any, was such that it was reasonably calculated to cause and probably did cause the rendition of an improper judgment. In substance, the witness's testimony related only to the conversation he overheard between Bob Drouet and Louis Davis in which he testified he heard Drouet tell Louis Davis to go to Houston and pick up the supplies. Thus, his testimony is merely cumulative of the testimony already given by James Davis with regard to the same conversation. Bob Drouet did not testify in the trial of this cause and insofar as we have been able to find, there is no testimony disputing the fact that Bob Drouet instructed Louis Davis to go to company headquarters in Houston and pick up the needed supplies.

■ Before a judgment may be reversed because of the admission of testimony two things must appear: First, the testimony must have been inadmissible and improper and secondly, it must have been such as to satisfy the reviewing court that it was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case. Rule 434, Tex.R.Civ.P.; *Aultman v. Dallas Ry. & Terminal Co.*, 152 Tex. 509, 260 S.W.2d 596 (1953); *Missouri-Kansas-Texas R.R. v. Bush*, supra. In light of the whole record we cannot say that there is more reason than not to believe that the jury's verdict and the judgment in favor of appellees was caused by the admission of the testimony in question. Appellant's first point is overruled.

■ By its sixth point appellant contends that the trial court erred in excluding from evidence the title page of the deposition of Nancy Smith Graham. Appellant

had sought to introduce the same to impeach her testimony by showing that she was a party defendant to this lawsuit at the time her deposition was taken. Nancy Smith Graham was the driver of the automobile which deceased, Louis Davis, rear-ended before colliding with the tractor-truck. Her deposition testimony concerned only what occurred at the scene of the accident and, therefore, related solely to the issue of negligence. Nowhere, either in its motion for new trial or by any point of error on this appeal, does appellant attack the jury's findings that Louis Davis was negligent and his negligence proximately caused the collision. Appellant therefore waived its right to complain of such findings. Since appellant registered no complaint to these findings, the fact that the trial court refused to allow evidence to impeach a witness who testified only with regard to the question of negligence and proximate cause would be immaterial. To sustain the point would not avail anything beneficial to appellant because the jury's findings of negligence and proximate cause established such facts and the quality of the evidence establishing the same does not constitute a viable issue in the case. Appellant's sixth point is overruled.

██ Under its seventh point appellant asserts that the trial court committed reversible error by giving a supplemental charge requiring further deliberations after the jury reported that it was deadlocked. Appellant contends that the charge was coercive and compelled the jury to reach a verdict. In reply, appellees contend that appellant waived its right to complain of the charge because no objection was made to the charge before the supplemental charge was read to the jury and also because nowhere in its motion for new trial did appellant complain of the charge on the ground that it amounted to coercion. We sustain appellees' contention and overrule the point.

When the trial court proposed the supplemental charge, counsel for appellant made the following statement:

"We think that it is contrary to the instructions given to the jury when they are chosen originally, and the instructions read to them by the Court and that in light of the note, sent to the Court with respect to the jury being hopelessly deadlocked, that under the circumstances no instruction whatever by the Court would be proper under the circumstances."

The trial court made no ruling in response to the foregoing statement apparently because the court did not consider it as an objection. Appellant now takes the position that the statement amounts to an objection on the ground that the charge was coercive. It is readily apparent, we think, that the complaint was insufficient to show that an objection was being made on that ground. Since the court did not rule thereon and counsel made no request for a ruling, the court was authorized to treat the statement as a mere expression of counsel's opinion. In any event, the complaint clearly was insufficient to apprise the court that an objection was being made on the ground of coerciveness. Had such an objection been made on that ground, the trial court might have deleted some parts of the supplemental charge or might not have given it at all. A party objecting to a charge has the duty to point out distinctly to the trial judge the matter to which he objects and the ground of his objection. Rule 274, Tex.R.Civ.P. Proper objection not having been made in the trial court appellant cannot now contend that the charge was coercive for the first time on appeal.

Furthermore, even if the complaint could be considered as an objection on the grounds that the charge was coercive, appellant's assignment of error in its motion for new trial did not complain that the supplemental charge was coercive.[2] A ground of error must be distinctly set forth

---

2. The assignment of error in the motion for new trial read as follows:

"The Court erred in its charge to the jury wherein the Court required further delibera-tion after the jury had announced it could not reach a decision."

in the motion for new trial or otherwise the assignment will be considered waived. Rule 374, Tex.R.Civ.P. The foregoing assignment fails to allege what, if anything, appellant deemed to be wrong with the supplemental charge. The only complaint is that the court erred in requiring further deliberations. As we view it, the assignment falls short of the requirement that a ground of the error must be distinctly set forth in the motion for new trial. The reason for the rule is to give the trial judge an opportunity to identify and understand the alleged error so that he can correct the error if possible, or in the alternative grant a new trial. Rule 321, Tex.R.Civ.P.; *Casey v. Barkley*, 527 S.W.2d 256 (Tex.Civ.App.— Corpus Christi 1975, no writ). This mandatory procedure not having been followed, appellant cannot now raise the alleged error of coerciveness for the first time on appeal. Having concluded that the point was waived, we do not reach the question of whether or not the charge was coercive. Appellant's seventh point is overruled.

■ Under its eighth and ninth points appellant contends that the trial court erred in overruling its motion for new trial because there is no evidence to support the jury's finding that Verna Jane Martin suffered a pecuniary loss as the result of the death of her father, and alternatively that the evidence is factually insufficient to support the finding.

At the time of Kenneth's death, Verna Jane was three and a half years of age. Kenneth and Jane Martin separated on March 8, 1963, when Verna Jane was less than one year of age. Their divorce became final about a month and a half before he was killed in the accident in question. Service of citation having been obtained by publication, the divorce decree contained no order for child support payments. During their marriage Kenneth and Jane owned their home and resided in Amarillo, Texas. Kenneth worked as a long-haul truck driver. He also spent some time working on a ranch in Nevada as well as on his parent's farm in New Mexico. He came home only occasionally and was gone for long periods

of time. Jane testified that during the marriage Kenneth provided for their basic food, transportation and shelter. She testified that the only time he came home was when he would come through on a truck. She testified that although he contributed some money to support her and Verna Jane, it wasn't very much. She estimated that the money contributions and gifts from Kenneth to his daughter amounted to approximately $500 to $750 per year. She testified that he loved his daughter and cared for her.

At the time of his death Kenneth was employed as a long-haul truck driver for J. H. Rose Truckline, Inc. receiving an annual income of between $8,000 and $9,000 per year. He also shared profits as a part owner from a peanut farm in New Mexico with his parents from which he received approximately $800 per year. The testimony further shows that a truck driver doing the same work as he was doing would, under certain circumstances, be capable of earning $17,000 per year. At the time of his death the deceased was 47 years of age and according to the testimony had a life expectancy of 34.6 years.

Viewing the testimony in a light most favorable to the verdict and judgment, we are of the opinion that there is evidence of probative force to show that Verna Jane Martin, suffered a pecuniary loss as a result of the death of her father. While there is some evidence indicating that he may not have been all that could be expected of a dutiful and devoted father, we cannot agree with appellant's contention that there is no evidence to support an award of any damages. Likewise we cannot agree with the contention that the evidence is factually insufficient to support an award of damages. Appellants' eighth and ninth points are overruled.

This brings us to appellant's tenth and final point by which it seeks a remittitur.

■ There are two distinct lines of authority in Texas as to how both a trial court and an appellate court should determine the question of excessiveness. Some courts follow precedents set in similar cases in deter-

mining whether damages awarded are excessive. Other courts consider only the record in the particular case under review without recourse to prior decisions. *Halliburton Company v. Olivas*, 517 S.W.2d 349 (Tex.Civ.App.—El Paso 1974, no writ); *Collins v. Gladden*, 466 S.W.2d 629 (Tex.Civ.App.—Beaumont 1971, writ ref'd n.r.e.); *Kimbriel Produce Co. v. Webster*, 185 S.W.2d 198 (Tex.Civ.App.—San Antonio 1944, writ ref'd w.o.m.). The practice of comparing awards in other cases is unsatisfactory because of the factual differences in the cases and also because of the continual erosion of the value of the dollar. Inadequate as it is, we prefer the "particular case" approach.

There is no rule prescribing the manner by which the courts determine whether the damages are too large or too small. Rule 328, Tex.R.Civ.P. All a court can do and all that is required of it by said rule, is to exercise its sound judicial judgment and discretion in the ascertainment of what amount would be reasonable compensation for the loss or injury sustained, and treat the balance, if any, as excess. *Flanigan v. Carswell*, 159 Tex. 598, 324 S.W.2d 835 (1959); *Wichita Valley Ry. v. Williams*, 116 Tex. 253, 288 S.W. 425 (Tex.Com.App. 1926, jdmt. adopted); *Berne v. Keith*, 361 S.W.2d 592 (Tex.Civ.App.—Houston 1962, writ ref'd n.r.e.).

In a wrongful death case, the earning capacity of the deceased is not the sole basis for damages in such a case. "Every father and husband has for his wife and children a pecuniary value beyond the amount of his earnings by his labor or vocation." 17 Tex.Jur.2d, Death by Wrongful Act, sec. 60, p. 613. However, in a wrongful death action a computation of pecuniary loss based upon the projection into the future of the deceased's past earnings is the primary element of such awards and the award should bear some ascertainable relation to the pecuniary benefits which the decedent's spouse or child might reasonably have expected to receive had the wrongful death not occurred. *Halliburton Co. v. Olivas*, supra; *Simpson v. United States*, 322 F.2d 688 (5th Cir. 1963).

There is no question that the deceased's earning capacity, had he lived, was such that he could have contributed a substantial part of the damages awarded by the jury. The crucial question is what amount his daughter, Verna Jane Martin, could reasonably have expected. The jury concluded that but for his death she would have received care, maintenance, support, service, education, advice, counsel and financial assistance worth $50,000.00. In passing on the propriety of the verdict this court must first arrive at a conclusion as to what sum would be reasonable if it had been assessed by the jury in order to determine whether the verdict was excessive in amount. *Texas & N.O.R.R. v. Syfan*, 91 Tex. 562, 44 S.W. 1064, 1066 (1898); *Collins v. Gladden*, supra. In considering what amount Verna Jane could reasonably have expected in the future in the way of financial support, advice and counsel we must consider her father's devotion to her before his death. The evidence shows that he was only an occasional father, coming home only when he came through Amarillo on a truck. His whereabouts were unknown at the time of her birth. After her birth she spent three months in an incubator. When her mother located him in Nevada he sent $400 for the hospital bill. While the evidence shows he provided for the basic needs of life for his family, he sent money only occasionally and at times his wife was required to call on his parents for money. According to his wife he gambled, and his whereabouts were unknown most of the time. After considering all the circumstances, as well as the ever-decreasing value of the dollar, we think the sum of $35,000.00 would be reasonable. The verdict and judgment is therefore excessive in the amount of $15,000.00. If, within fifteen days from the date of this judgment, appellee, Jane Martin Lee, next friend of Verna Jane Martin, files a remittitur in writing of $15,000.00 to be paid out of the $23,065.20 awarded by the court to Verna Jane Martin, the judgment will be reformed and affirmed, otherwise the judgment will be reversed and remanded as to this appellee.

Finding no reversible error the judgment is affirmed as to all parties except appellee, Jane Martin Lee, next friend of Verna Jane Martin, as to which party the judgment is conditionally affirmed.

## SUPPLEMENTAL OPINION

Appellee, Janie Martin Lee, next friend of Verna Jane Martin, having filed in writing the remittitur as suggested in our original opinion and no motion for rehearing having been filed on her behalf, it is ordered that the judgment as rendered by the remittitur be affirmed.

## ON MOTION FOR REHEARING

Our remarks heretofore made on Appellant's Motion for Rehearing are withdrawn and the following is substituted in lieu thereof.

■ Appellant complains of our statement in our original opinion that counsel for appellant failed to object to the court's supplemental charge on the ground that the charge was coercive. We stand corrected. Counsel did register an objection to the charge on that ground. The objection appears in the statement of facts under two paragraphs and somehow we overlooked the paragraph wherein counsel objected to the coercive nature of the charge. The fact remains, however, that the record fails to show that the trial court made a ruling thereon in accordance with the mandatory provisions of Rule 272 of the Texas Rules of Civil Procedure. Appellant does not assign as error the action by the court in overruling its objection to the charge because there was no ruling. Therefore we are not authorized to consider the complaint. It is only from alleged erroneous rulings that an appeal may be perfected. Appellant's motion for rehearing is overruled.